**Deborah STANLEY, Plaintiff,**

v.

**NOVARTIS PHARMACEUTICALS CORPORATION, Defendant.**

**Case No. CV 11–03191–JGB (OPx).**

United States District Court, C.D. California.

Signed April 2, 2014.

988

Elizabeth R. Odette, Lockridge Grindal Nauen PLLP, Minneapolis, MN, Jeffrey C. Bogert, Jeffrey C. Bogert Law Offices, Santa Monica, CA, John A. Girardi, Molly B. Weber, Girardi Keese, Los Angeles, CA, John J. Vecchione, John J. Vecchione Law PLLC, Fairfax, VA, Mel Ira Burman Powell, Powell Law Firm, Beverly Hills, CA, for Plaintiff.

James M. Sullivan, Katharine R. Latimer, Hollingsworth LLP, Washington, DC, Amy R. Fiterman, Christine R.M. Kain, James A. O'Neal, Faegre Baker Daniels LLP, Minneapolis, MN, Brent G. Cheney, Katharine R. Latimer, Richard A. Clark, Parker Milliken Clark O'Hara & Samuelian APC, Los Angeles, CA, for Defendant.

## ORDER

**[Motions filed November 18, 2013]**

JESUS G. BERNAL, District Judge.

Before the Court is a Motion Summary Judgment, a Motion to Exclude Testimony of Plaintiff's Case–Specific Experts, and a Motion for *Daubert* Evidentiary Hearing filed by Defendant Novartis Pharmaceuticals Corporation. (Doc. Nos. 55, 61, 63.) After considering the papers in support of and in opposition to the motion and arguments presented at the January 6, 2014 hearing, the Court GRANTS IN PART and DENIES IN PART Defendant's Motion to Exclude Testimony of Plaintiff's Case–Specific Experts (Doc. No. 61), DENIES IN PART Defendant's Motion for *Daubert* Evidentiary Hearing (Doc. No. 63), and GRANTS IN PART and DENIES IN PART Defendant's Motion for Summary Judgment (Doc. No. 55).

### I. PROCEDURAL HISTORY

Plaintiff Deborah Stanley ("Plaintiff") filed a Complaint against Defendant No-

vartis Pharmaceuticals Corporation ("Defendant" or "Novartis") on April 14, 2011, alleging claims for strict liability, negligence—negligent manufacture, negligence—failure to warn, breach of express warranty, and breach of implied warranty. (Doc. No. 1.) On August 6, 2011, Plaintiff moved to transfer this case to the MDL court for pretrial proceedings. (Doc. No. 11.) The Panel on Multidistrict Litigation denied the transfer motion on December 15, 2011. (Doc. No. 19.)

On February 8, 2012, Novartis moved to stay the action for the remainder of 2012, arguing that developments in other cases involving Zometa and Aredia, including those that were part of the MDL, would assist in the efficient resolution of this action. (Doc. No. 27.) The Court (Morrow, J.) denied the Motion to Stay on April 13, 2012. (Doc. No. 36.)

On November 15, 2013, the Parties stipulated to the dismissal of Plaintiff's claims for manufacturing defect (part of Plaintiff's strict liability claim), negligent manufacturing, and breach of express warranty. (Doc. No. 50.) On November 18, 2013, Defendant filed a Motion for Summary Judgment ("MSJ," Doc. No. 55), attaching:

- Declaration of Brent G. Cheney ("Cheney Decl.," Doc. No 55–2), which attests to Exhibits 1–48[1] (Doc. No. 55–3), and
- Statement of Undisputed Material Facts ("SUF," Doc. No. 56–1).

On December 2, 2013 and December 3, 2013, Plaintiff filed an Opposition (Doc. No. 84), attaching:

- Declaration of John A. Girardi ("Girardi Decl.," Doc. No. 85), which at-

tests to Exhibits 1–26 (Doc. Nos. 85–1–85–26);

- Declaration of Deborah Stanley ("Stanley Decl.," Doc. No. 88);
- Declaration of Eric Sung ("Sung Decl.," Doc. No. 89); and
- Statement of Genuine Disputes ("SGD," Doc. No. 83).

On December 9, 2013 Defendant replied (Doc. No. 98), attaching:

- Declaration of Brent G. Cheney ("Cheney Decl. iso Reply," Doc. No. 98–1), which attests to Exhibits 1–4, and
- Evidentiary Objections and Responses to Plaintiff's SGD (Doc. No. 99).

On November 18, 2013, Defendant also filed a related Motion to Exclude Testimony of Plaintiff's Case Specific Experts ("Motion to Exclude," Doc. No. 61) and a Motion for a *Daubert* Evidentiary Hearing (Doc. No. 63).

On December 2, 2013 and December 3, 2013, Plaintiff opposed the Motion to Exclude and Motion for a *Daubert* Hearing (Doc. Nos. 82, 86.)

Defendant replied on December 9, 2013. (Doc. No. 97, 100.)

## II. LEGAL STANDARD[2]

### A. Motion for Summary Judgment

A motion for summary judgment shall be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48,

---

1. Due to the volume of evidence filed in support of, in opposition to, and in reply in support of the MSJ, the Court does not enumerate each attached Exhibit, but describes the documents in the evidentiary citations as needed.

2. Unless otherwise noted, all references to "Rule" refer to the Federal Rules of Civil Procedure.

106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

Generally, the burden is on the moving party to demonstrate that it is entitled to summary judgment. *Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir.1998); *Retail Clerks Union Local 648 v. Hub Pharmacy, Inc.*, 707 F.2d 1030, 1033 (9th Cir.1983). The moving party bears the initial burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

When the non-moving party has the burden at trial, however, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. Instead, the moving party's burden is met by pointing out there is an absence of evidence supporting the non-moving party's case. *Id.*

The burden then shifts to the non-moving party to show that there is a genuine issue of material fact that must be resolved at trial. Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. The non-moving party must make an affirmative showing on all matters placed in issue by the motion as to which it has the burden of proof at trial. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *see also* William W. Schwarzer, A. Wallace Tashima & James M. Wagstaffe, *Federal Civil Procedure Before Trial*, 14:144. "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir.2010)

(citing *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505). "The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." *In re Oracle*, 627 F.3d at 387 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. In ruling on a motion for summary judgment, the Court construes the evidence in the light most favorable to the non-moving party. *Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991); *T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir.1987).

### B. Motion to Exclude Expert Testimony

Expert witness testimony is governed by Federal Rule of Evidence 702, which provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702. Rule 702 should be applied consistent with the "liberal thrust" of the Federal Rules and their "general ap-

proach of relaxing the traditional barriers to 'opinion testimony'." *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 588, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (citing *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 169, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988)). A trial court's "gatekeeping" obligation to admit only expert testimony that is both reliable and relevant is especially important "considering the aura of authority experts often exude, which can lead juries to give more weight to their testimony." *Mukhtar v. Cal. State Univ.,* 299 F.3d 1053, 1063–64 (9th Cir.2002). Nevertheless, "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook,* 598 F.3d 558, 564 (9th Cir.2010).

 The trial court is accorded wide discretion when acting as gatekeepers for the admissibility of expert testimony. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 151–52, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). As an initial matter, the court must determine if a witness has the required expertise, whether it be "knowledge, skill, experience, training, or education" under Rule 702(a). Next, Courts must ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The expert's opinion must be based on "scientific knowledge;" opinions based on unsubstantiated generalizations or opinions not derived by the scientific method must be excluded. *Daubert v. Merrell Dow Pharms.,* 43 F.3d 1311, 1316 (9th Cir.1995).

### C. Choice of Law

 "To determine the applicable substantive law, a federal court sitting in diversity applies the choice-of-law rules of the forum." *Narayan v. EGL, Inc.,* 616 F.3d 895, 898 (9th Cir.2010) (citing *Fields v. Legacy Health Sys.,* 413 F.3d 943, 950 (9th Cir.2005)). When two states are potentially interested in having their laws applied, California courts employ a governmental interest analysis to determine possible conflicts of law for issues not governed by contractual choice of law provisions. *Smith v. Cimmet,* 199 Cal.App.4th 1381, 1395, 132 Cal.Rptr.3d 276 (2011); *see Bernhard v. Harrah's Club,* 16 Cal.3d 313, 316, 128 Cal.Rptr. 215, 546 P.2d 719 (1976) (superseded by statute on other ground as stated in *Cory v. Shierloh,* 29 Cal.3d 430, 434, 174 Cal.Rptr. 500, 629 P.2d 8 (1981)); *Hurtado v. Superior Court,* 11 Cal.3d 574, 580–81, 114 Cal.Rptr. 106, 522 P.2d 666 (1974).

 "The first step in the governmental interest analysis is to determine whether the applicable rules of law of the potentially concerned jurisdictions materially differ. If there is no material difference, there is no choice-of-law problem and the court may proceed to apply California law." *Frontier Oil Corp. v. RLI Ins. Co.,* 153 Cal.App.4th 1436, 1465, 63 Cal.Rptr.3d 816 (2007) (citing *Washington Mutual Bank, FA v. Superior Court of Orange County,* 24 Cal.4th 906, 919, 103 Cal. Rptr.2d 320, 15 P.3d 1071 (2001)) (internal citations omitted). "If the applicable rules of law differ materially, the court proceeds to the second step, which involves an examination of the interests of each jurisdiction in having its own law applied to the particular dispute. If each jurisdiction has an interest in applying its own law to the issue, there is a 'true conflict' and the court must proceed to the third step. In the third step, known as the comparative impairment analysis, the court determines which jurisdiction has a greater interest in the application of its own law to the issue

or, conversely, which jurisdiction's interest would be more significantly impaired if its law were not applied. The court must apply the law of the jurisdiction whose interest would be more significantly impaired if its law were not applied." *Id.* at 1456, 63 Cal.Rptr.3d 816 (citing *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal.4th 95, 107–108, 45 Cal.Rptr.3d 730, 137 P.3d 914 (2006) and *Briseno*, 24 Cal.4th at 919–20, 103 Cal.Rptr.2d 320, 15 P.3d 1071).

## III. FACTS

### A. Evidentiary Objections

Defendant objects to the Second Declaration of Robert G. Germany (Doc. No. 85–2) as a self-serving affidavit not based on personal knowledge, hearsay, and presenting arguments. (Doc. No. 99.) Defendant additionally objects to the Declaration of Dr. Eric Sung (Doc. No. 89) as it presents new expert opinions not disclosed in Dr. Sung's expert report. (Reply iso MSJ at 4–5.) The Court did not rely on either of these declarations in its rulings. Thus, the Court declines to rule on these objections.

### B. Uncontroverted and Controverted Facts

Except as noted, the following material facts are sufficiently supported by admissible evidence and are uncontroverted. They are "admitted to exist without controversy" for purposes of the Motions for Summary Judgment. L.R. 56–3 (facts not "controverted by declaration or other written evidence" are assumed to exist without controversy); Fed.R.Civ.P. 56(e)(2) (stating that where a party fails to address another party's assertion of fact properly, the court may "consider the fact undisputed for purposes of the motion").

*Aredia, Zometa, and Generic Pamidronate*

Aredia and Zometa are intravenous bisphosphonate drugs prescribed to cancer patients with multiple myeloma or other cancer that has metastasized to bone. Their purpose is to reduce or delay potentially serious skeletal complications, such as pathologic fractures or pressure to the spinal cord that can result from bone damage from these cancers. (Def. SUF ¶ 1.) The Food and Drug Administration ("FDA") approved Aredia for treatment of hypercalcemia of malignancy in 1991 and for treatment of oseolytic bone lesions of multiple myeloma in 1995. (*Id.* ¶¶ 4–5.) The FDA approved Zometa for the treatment of hypercalcemia of malignancy in 2001 and for the treatment of multiple myeloma and bone metastases from solid tumors in 2002. (*Id.* ¶¶ 6–7.)

In April 2001, the FDA approved a generic pamidronate as a bioequivalent to Aredia. (*Id.* ¶ 68.) The FDA has subsequently approved additional generic pamidronate products sold by companies other than Novartis. (*Id.* ¶ 69.) After April 2001, Aredia sales began to decrease and the Aredia share of the pamidronate market decreased with competition from generic pamidronate products. (*Id.* ¶¶ 70, 71.)

*Changes to Aredia and Zometa Package Inserts*

In December 2002, Novartis received a report of osteonecrosis of the jaw ("ONJ") in a patient receiving Aredia or Zometa. (Pl. SGD ¶ 5.) ONJ is a site-specific pathology. (Def. SUF ¶ 8.) In September 2003, the Journal of Oral and Maxillofacial Surgery published a medical alert that addressed an association between bisphosphonate drugs and ONJ. (*Id.* ¶ 9.) On September 26, 2003, Novartis informed the FDA that it was voluntarily revising the Aredia and Zometa package inserts to include language reflecting information on the reports of ONJ associated with the use of intravenous bisphosphonates:

Cases of osteonecrosis (primarily of the jaws) have been reported since market introduction. Osteonecrosis of the jaws has other well documented multiple risk factors. It is not possible to determine if these events are related to Zometa or other bisphosphonates, to concomitant drugs or other therapies (e.g. chemotherapy, radiotherapy, corticosteroid), to patient's underlying disease, or to other co-morbid risk factors (e.g. anemia, infection, pre-existing oral disease).

(*Id.* ¶ 10.) The FDA accepted the submitted revised package insert. (*Id.* ¶ 11.) In the fall of 2004, Novartiz revised the Aredia and Zometa package inserts to include the following language:

> Osteonecrosis of the jaw (ONJ) has been reported in patients with cancer receiving treatment regimens including bisphosphonates. Many of these patients were also receiving chemotherapy and corticosteroids. The majority of reported cases have been associated with dental procedures such as tooth extraction. Many had signs of local infection including osteomyelitis.
>
> A dental examination with appropriate preventative dentistry should be considered prior to treatment with bisphosphonates in patients with concomitant risk factors (e.g., cancer, chemotherapy, corticosteroids, poor oral hygiene).
>
> While on treatment, these patients should avoid invasive dental procedures if possible. For patients who develop ONJ while on bisphosphonate therapy, dental surgery may exacerbate the condition. For patients requiring dental procedures, there are no data available to suggest whether discontinuation of bisphosphonate treatment reduces the risk of ONJ. Clinical judgment of the treating physician should guide the management plan of each patient based on individual benefit/risk assessment.

(*Id.* ¶ 12.) In September 2004, Novartis sent a "Dear Doctor" letter informing recipients about the new language about ONJ in the Aredia and Zometa package inserts. (*Id.* ¶ 13.) The letter was sent to thousands of prescribing physicians and to the FDA, as well as posted on the FDA's publically accessible MedWatch website. (*Id.*) Additionally, an article about the September 2004 labeling change was posted on the American Dental Association website in December 2004. (*Id.* ¶ 14.) In May 2005, Novartis sent a "Dear Dentist" letter about Aredia and Zometa package insert revisions regarding ONJ to dental care providers using the American Dental Association mailing list. (*Id.* ¶ 15.) The letter stated that the package inserts recommended avoiding invasive dental procedures, if possible, for patients treated with bisphosphonates. (*Id.*)

*Plaintiff's Medical and Dental History*

In March 2000, Plaintiff was diagnosed with an advanced stage of multiple myeloma known as plasma cell leukemia. (*Id.* ¶ 18.) Dr. Molina, Plaintiff's oncologist at City of Hope National Medical Center ("City of Hope"), admitted Plaintiff to the hospital in March 2000 because she had impending spinal cord compression due to her malignancy. (*Id.* ¶ 20.) After Plaintiff received chemotherapy and was discharged from the hospital, she received radiation therapy to her spine. (*Id.* ¶ 22.) Radiation to bone is one of the skeletal-related events that Aredia and Zometa are designed to prevent. (*Id.* ¶ 23.)

In May 2001, Dr. Molina noted that Plaintiff had osteoporosis and put her on a course of Aredia therapy (monthly Aredia infusions) starting in June 2001 to prevent osteoporosis and skeletal complications of multiple myeloma. (*Id.* ¶¶ 25–26, 28.) According to Plaintiff, when she first started

her Aredia therapy, she did not have any dental problems. (*Id.* ¶ 30.)

In July 2002, Dr. Molina decided Plaintiff's bisphosphonate therapy should be switched from Aredia to monthly Zometa infusions, and Plaintiff began the Zometa therapy in August 2002. (*Id.* ¶¶ 33, 34.) At the time Dr. Molina initially prescribed Zometa to Plaintiff, he was unaware of the relationship between bisphosphonates and ONJ and did not have any discussions with Plaintiff regarding the relationship. (Pl. SGD ¶¶ 21, 22.) Dr. Molina testified that he likely would have still prescribed Aredia and Zometa to Plaintiff if he had known of the potential risk, but he would have discussed the pros and cons with Plaintiff and set a specific course of treatment that may have been more conservative and included dental evaluations. (Def. SUF ¶ 37; Molina Depo. at 142:1–25.)

Dr. Molina left City of Hope in October 2002. (Def. SUF ¶ 35.) While Plaintiff was under Dr. Molina's care, she did not experience any jaw problems. (*Id.* ¶ 36.)

In October 2002, Dr. Nakamura, another City of Hope oncologist, began treating Plaintiff. (*Id.* ¶ 39.) He continued Plaintiff's Zometa therapy because she had bone lesions and remained at risk for multiple myeloma. (*Id.* ¶ 40.) In February 2005, Dr. Nakamura switched Plaintiff from Zometa therapy to monthly pamidronate and prescribed pamidronate during 2005 and 2006. (*Id.* ¶¶ 42, 43.) Dr. Nakamura testified (and his notes reflect) that he had multiple discussions about the possible benefits and also side effects of pamidronate prior to January 2007 and in early 2007. (*Id.* ¶¶ 44, 45.) Plaintiff states in her declaration that she was never warned of the relationship between bisphosphonate use and ONJ prior to having her 2009 dental work done. (Pl. SGD ¶ 12.)

On June 30, 2007, Plaintiff was admitted to the hospital with acute sinusitis; she was discharged on July 2, 2007. (Def. SUF ¶¶ 47, 48.) Plaintiff was not advised during her hospital stay or afterward of any concern that her sinus infection could be ONJ or ONJ related, or that Aredia or Zometa could be involved. (Pl. SGD ¶ 20.)

Plaintiff's therapy continued for another year and a half and she received her last pamidronate infusion on January 14, 2009. (Def. SUF ¶ 49.) Dr. Nakamura's clinic notes from October 2008, January 2009, and January 2010 refer to Aredia, but Dr. Nakamura testified that the reference to Aredia could have also been a generic pamidronate. (Nakamura Depo. at 129:4–6; Clinic Notes, Girardi Decl., Exs. 6–8.)

Dr. Nakamura learned about the potential side effect of ONJ related to bisphosphonates in approximately late 2004 or 2005. (Def. SUF ¶ 51.) If Dr. Nakamura had known about the potential side effect of ONJ in 2002 when he started treating Plaintiff, he still would have prescribed Zometa or pamidronate to Plaintiff. (*Id.* ¶ 50.) After Aredia went off patent, Dr. Nakamura has not pushed for name brand Aredia when prescribing the drug to his patients, so patients could have used Aredia or a generic pamidronate. (*Id.* ¶ 53.) Dr. Nakamura changed his practice regarding referring patients or suggesting they get dental care because of the awareness of ONJ with the use of bisphosphonates. (Pl. SGD ¶¶ 29, 30.)

In March 2009, Plaintiff had tooth pain and was treated for a dental infection. She was also scheduled for a tooth extraction. (*Id.* ¶ 54.) Plaintiff discussed the potential tooth extraction with Dr. Nakamura before the procedure. (*Id.* ¶ 55.) Dr. Calicdan, Plaintiff's dentist, concluded that teeth in Plaintiff's lower jawbone needed to be extracted and there were no treatment options other than extraction. (*Id.* ¶ 57.) In June 2009, Dr. Calicdan

extracted three of Plaintiff's lower teeth, without complications. (*Id.* ¶ 61.) In August 2009, Dr. Calicdan extracted the four remaining teeth in Plaintiff's lower jaw, without complications. (*Id.* ¶ 62.) Dr. Calicdan had been aware of the potential association between bisphosphonates and ONJ since 2006 or 2007. (*Id.* ¶ 64.) However, when Dr. Calicdan extracted Plaintiff's teeth, she was not aware that Plaintiff had been treated with bisphosphonate medications. (*Id.* ¶ 63.) Plaintiff's alleged ONJ was treated without any surgical procedures. (*Id.* ¶ 67.)

Prior to having her 2009 tooth extractions, Plaintiff was not told about the need to maintain good oral health and hygiene and/or avoid invasive dental procedures, including tooth extractions. (Pl. SGD ¶ 15.) If Plaintiff had been warned of the relationship between ONJ and bisphosphonates, she would have been more diligent in maintaining her oral health and hygiene and made regular dental appointments to monitor her oral health and hygiene. (*Id.* ¶¶ 16, 17.) Plaintiff was not warned until after her 2009 tooth extractions that she needed to inform and advise her dental care providers that she had received Aredia or Zometa. (*Id.* ¶ 18.) Plaintiff was not aware that she could develop ONJ from tooth extractions or other invasive dental treatments even if she was not actively being given bisphosphonates. (*Id.* ¶ 19.)

## IV. DISCUSSION

### A. Motion to Exclude Testimony of Plaintiff's Case–Specific Experts

Defendant moves to exclude the testimony of five of her treating health care providers (Dr. Molina, Dr. Nakamura, Dr. Feng, Dr. Calicdan, Dr. Epstein) as to the cause of Plaintiff's ONJ, pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and Federal Rule of Evidence 702. Additionally, Plaintiff moves to exclude the specific causation opinion of Plaintiff's retained expert, Dr. Eric Sung.

### 1. Plaintiff's Treating Physicians

Plaintiff does not argue that her treating physicians should be allowed to testify regarding causation. She only argues that her treating physicians can testify as to Plaintiff's symptoms, tests, diagnosis, and treatment, and states that Dr. Sung will testify regarding specific causation. (Mot. to Exclude Opp. at 15–16.)[3] Thus, the Court GRANTS Defendant's Motion to Exclude the specific causation testimony of Plaintiff's treating physicians.

### 2. Dr. Eric Sung

Plaintiff designated Dr. Eric Sung as an expert on September 27, 2013. (Plaintiff's Rule 26(a)(2)(A) Statement, Doc. No. 61–3.) After reviewing Plaintiff's medical and dental records, the depositions of Plaintiff's treating physicians, and Plaintiff's deposition, Dr. Sung opined that Plaintiff has a history of ONJ due to her treatment with Aredia, Zometa, and pamidronate. (*See* Sung Report, Doc. No. 63–1.) Dr. Sung's deposition was taken in this action on November 13, 2013. (See 11/13/13 Sung Depo., Doc. No. 61–4.)

Defendant moves to exclude Dr. Sung from testifying on the bases that Dr. Sung is not an expert on the main alternate

---

**3.** At the hearing, Plaintiff stated that Plaintiff would seek to introduce Dr. Epstein's statement that "this is a classical expression of bisphosphonate related osteonecrosis of the jaw." (1/6/14 Tr.) This argument was not raised in Plaintiff's Opposition. The Court declines to consider arguments first made at the hearing. *See White v. FedEx Corp.*, No. 04–0099, 2006 WL 618591, at 2 (N.D.Cal. Mar. 13, 2006) ("The Court will not consider any arguments or evidence raised for the first time at the hearing.").

causes of ONJ at issue, chronic osteomyelitis and alpha interferon, and his opinion is not based on reliable methodology. (Mot. to Exclude at 17–20.) Defendant alternatively moves the Court to preclude Dr. Sung from offering opinions on dosing and testifying about his examination of Plaintiff. (*Id.* at 20–22.)

### a. Causation Testimony

*Qualifications*

Dr. Sung is a dentist who is a Professor of Clinical Dentistry, Maxillo–Facial and Hospital Dentistry Subgroup Director, and Co-chair of the Head and Neck Cancer and Maxillofacial Prosthetics Section of Advanced Prosthodontics and Hospital Dentistry at the University of California, Los Angeles ("UCLA") School of Dentistry. (Sung CV at 3, Doc. No. 86–8.) Dr. Sung has focused on cancer in his dental work, performed studies on cancer patients, and treated head and neck cancer patients, including patients with ONJ with a history of bisphosphonates. (Sung Opp. at 5; 4/20/11 Sung Depo. at 44–45, 65, 100.) Additionally, Dr. Sung has authored publications and given presentations on cancer-related topics, including: the oral and dental management of patients undergoing chemotherapy, osteonecrosis as a complication to chemotherapy, dental implications of breast cancer treatment, and the association between bisphosphonates and ONJ. (Sung CV 8–22.)

 Defendant's only objection to Dr. Sung is that Dr. Sung does not have the required expertise in osteomyelitis and interferon to be able to reliably rule out those potential causes of Plaintiff's ONJ. (Mot. to Exclude Reply at 4–5.) However, the Court is not aware of a requirement that an expert testifying as to medical causation must be an expert in every possible cause of a condition, nor has Defendant cited to any authority suggesting this

is the case. As described above, Dr. Sung has treated multiple cancer patients taking bisphosphonates, including Aredia and Zometa, and has done extensive research and presented on issues related to ONJ and the dental care of patients with cancer. Based on Dr. Sung's experience as a practicing dentist and his research, the Court finds that Dr. Sung has the experience and knowledge necessary for a reliable evaluation of the cause of Plaintiff's ONJ.

*Reliability*

Defendant also argues that Dr. Sung did not use a reliable differential diagnosis because Dr. Sung did not mention or offer a basis for excluding osteomyelitis, which Defendant's retained expert found to be a likely explanation of the etiology of Plaintiff's ONJ, or alpha interferon in his report. (Mot. to Exclude at 18–19.)

 "A differential diagnosis [or etiology] is 'a patient-specific process of elimination that medical practitioners use to identify the most likely cause of a set of signs and symptoms from a list of possible causes.'" *Ruggiero v. Warner–Lambert Co.*, 424 F.3d 249, 254 (2d Cir.2005) (quoting *Hall v. Baxter Healthcare Corp.*, 947 F.Supp. 1387, 1413 (D.Or.1996)). The Ninth Circuit has held that differential diagnosis is a reliable methodology for determining causation. *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1058 (9th Cir.2003). "The first step in the diagnostic process is to compile a comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration. The issue at this point in the process is which of the competing causes are *generally* capable of causing the patient's symptoms or mortality. Expert testimony that rules in a potential cause that is *not* so capable is unreliable." *Id.* at 1057–58 (internal citations omitted); *see also West-*

*berry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir.1999) ("A differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation"). The second step is for the expert to engage in a process of eliminating or ruling out the identified potential causes. The "expert must provide reasons for rejecting alternative hypotheses using scientific methods and procedures and the elimination of those hypotheses must be founded on more than subjective beliefs or unsupported speculation." *Clausen*, 339 F.3d at 1058.

 Dr. Sung states in his report that, in reaching his opinion, he performed a differential diagnosis. (Sung Report at 6.) He acknowledges that cancer, radiation therapy, chemotherapy, corticosteroid therapy, periodontal disease, dental extractions, intra-oral trauma, diabetes, hypertension, anemia, smoking, alcohol abuse, and obesity are all risk factors for the development of ONJ. (Sung Report at 6.) Dr. Sung then goes on to explain why, based on Plaintiff's medical and dental history, he ruled out each of those alternative causes of Plaintiff's ONJ. (*Id.* at 6–7.)

 "A medical expert's opinion based upon differential diagnosis normally should not be excluded because the expert has failed to rule out every possible alternative cause of a plaintiff's illness." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir.2001). Generally, "an expert need not rule out every potential cause in order to satisfy *Daubert*," as long as the expert's testimony "address[es] obvious alternative causes and provide[s] a reasonable explanation for dismissing specific alternate factors identified by the defendant." *In re Fosamax Products Liab. Litig.*, 647 F.Supp.2d 265, 278 (S.D.N.Y. 2009). Therefore, to the extent Defendant argues that Dr. Sung did not adequately rule out additional factors, this is a credibility determination that goes to the weight and the admissibility of his opinions. Defendant can cross-examine Dr. Sung regarding additional factors that he did not rule out during trial. *See Stambolian v. Novartis Pharm. Corp.*, No. 12–4378, 2013 WL 6345566 (C.D.Cal. Dec. 6, 2013); *Davids v. Novartis Pharm. Corp.*, 857 F.Supp.2d 267, 279 (E.D.N.Y.2012); *Ferguson v. Riverside Sch. Dist. No. 416*, No. 00–0097, 2002 WL 34355958, at *9 (E.D.Wash. Feb. 6, 2002) ("[T]he defendants's contention that Dr. Johanning improperly ignored or discounted alternative causes will be the proper subject of cross-examination, but does not make his testimony inadmissible.").

Based on all of the information provided, the Court is satisfied that Dr. Sung is a qualified expert and his causation testimony is the product of reliable methods and sufficient facts and data reasonably relied upon by doctors in the field.

Accordingly, the Court DENIES Defendant's Motion to Exclude Dr. Sung's Causation Testimony and DENIES Defendant's Motion for a *Daubert* Evidentiary Hearing for Dr. Sung. *See Millenkamp v. Davisco Foods Inter., Inc.*, 562 F.3d 971, 979 (9th Cir.2009) (" 'District courts are not required to hold a *Daubert* hearing before ruling on the admissibility of scientific evidence.' ... The parties provided the district court with briefing on his scientific expertise and proposed testimony prior to trial. The district court could properly determine that this information comprised an adequate record from which the court could make its ruling.' ") (quoting *In re Hanford Nuclear Reservation Lit.*, 292 F.3d 1124, 1138 (9th Cir.2002)).

**b. Dosing Opinions**

 Defendant moves to exclude Dr. Sung's opinion that "[t]he cumulative dose

or duration of bisphosphonates strengthens [his] opinion as to cause, as the incidence and severity of BRONJ is related to time on bisphosphonate." (Mot. to Exclude at 20.) Defendant contends that this opinion is unreliable because the opinion is conclusory, and Dr. Sung only cited common knowledge, his clinical experience, and a study involving a drug Plaintiff did not use as the bases for the opinion. (Id. at 20–21.) Plaintiff counters that Dr. Sung bases his opinion on the duration and cumulative dose of bisphosphonates Plaintiff has taken, Dr. Sung's clinical experience, the Fosamax study and AAMOS website, Plaintiff's medical history, and the deposition transcripts of Plaintiff's experts. (Mot. to Exclude Opp. at 13–14.)

The Court agrees that Dr. Sung has not provided any data to support the reliability of his dosing opinion, as he only vaguely referenced potential sources of information on which he based this opinion during his deposition, and there is no indication that Dr. Sung used any methodology in reaching this conclusion. Thus, the Court GRANTS Defendant's Motion to Exclude Dr. Sung's Dosing Opinion. *See Deutsch v. Novartis Pharmaceuticals Corp.,* 768 F.Supp.2d 420, 447 (E.D.N.Y.2011).

### c. Testimony Regarding Examination of Plaintiff

██ Based on Dr. Sung's expert report, which was served on October 4, 2013, Defendant assumed that Dr. Sung never examined Plaintiff. (Mot. to Exclude at 22; Reply iso Mot. to Exclude at 8.) However, Defendant learned at Dr. Sung's November 13, 2013 deposition that Dr. Sung examined Plaintiff on October 2, 2013. (Mot. to Exclude at 22.) Defendant requests that Dr. Sung be precluded from testifying about his examination of Plaintiff at trial.

Pursuant to Rule 37, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Here, Dr. Sung's report of his examination of Plaintiff is less than two pages, and Defendant does not contest Plaintiff's representation that Plaintiff agreed to leave the deposition of Dr. Sung open for further inquiry regarding the consultation and report.

The Court finds that the late disclosure of Dr. Sung's examination of Plaintiff was harmless. The Court DENIES Defendant's Motion to Exclude Dr. Sung's testimony regarding his examination of Plaintiff. Additionally, the Court reopens discovery solely to allow Defendant to take an additional deposition of Dr. Sung on the subject of his examination of Plaintiff and Consultation Report.

### B. Motion for Summary Judgment

### 1. Failure to Warn: Proximate Cause

██ A manufacturer of prescription drugs owes to the medical profession the duty of providing adequate warnings if it knows, or has reason to know, of any dangerous side effects of its drugs. *Carlin v. The Superior Court of Sutter County,* 13 Cal.4th 1104, 1112–13, 56 Cal. Rptr.2d 162, 920 P.2d 1347 (1996). California follows the learned intermediary doctrine, which provides that in the case of prescription drugs, the duty to warn "runs to the physician, not to the patient." *Id.* at 1116, 56 Cal.Rptr.2d 162, 920 P.2d 1347 (citations omitted). Thus, a manufacturer discharges its duty to warn if it provides adequate warnings to the physician about any known or reasonably knowable dangerous side effects, regardless of whether the warning reaches the patient. Additionally, "[a] plaintiff asserting causes of action based on a failure to warn must

prove not only that no warning was provided or the warning was inadequate, but also that the inadequacy or absence of the warning caused the plaintiff's injury." *Motus v. Pfizer Inc.*, 196 F.Supp.2d 984, 990–91 (C.D.Cal.2001).

■■■■ Defendant argues that summary judgment is appropriate on all Plaintiff's remaining claims because Plaintiff's oncologists stated that they still would have prescribed Aredia or Zometa if they had been aware of the risk of ONJ at the time they started prescribing the drugs. (MSJ at 10–12.) While the evidence supports that Dr. Molina and Dr. Nakamura would have prescribed Aredia or Zometa even if they knew about the potential association between these drugs and ONJ (*see* Def. SUF ¶¶ 37, 50), changes to treatment and prescription procedures creates a triable question of fact on specific causation. *See Georges v. Novartis Pharmaceuticals Corp.*, No. 06–5207, 2012 WL 9083365, at *5–6 (C.D.Cal. Nov. 2, 2012) (citing several district court cases involving Aredia and Zometa denying summary judgment where the plaintiff provided evidence that the physician would have changed a prescription or treatment procedure)[4]; *In re Aredia & Zometa Products Liab. Litig. (White)*, 3:06–MD–1760, 2009 WL 2497692, at *3 (M.D.Tenn. Aug. 13, 2009) ("[I]t is sufficient for Plaintiff to survive summary judgment to show that one of [plaintiff's] treating physicians ... would have behaved differently.") (applying California law). Here, Dr. Molina and Dr. Nakamura both testified that they would have a

different conversation with their patients regarding the risks and benefits in taking bisphosphonates. (Molina Depo. at 142:1–25; Pl. SGD ¶¶ 29, 30.) Additionally, Dr. Molina testified that he would now prescribe the drug in a more conservative manner, which would include dental monitoring. (Molina Depo. at 142:1–25.)

Thus, the Court finds that there is a genuine issue of material fact as to causation and the failure to warn, and the Court DENIES Defendant's MSJ as to this issue.

### 2. Specific Causation

Defendant also contends that it is entitled to summary judgment on all Plaintiff's claims because Plaintiff does not have any admissible specific causation testimony from experts. As discussed above, the Court has declined to exclude Dr. Sung's causation testimony. (*See supra* Section IV.A.2.) Thus, the Court DENIES Defendant's MSJ on the issue of specific causation.

### 3. Design Defect Claim

■■■■ Plaintiff asserts a claim for strict liability based on design defect. (See Compl. ¶ 25.) Under California law, "[a] manufacturer is strictly liable for injuries caused by a product that is (1) defectively manufactured, (2) defectively designed, or (3) distributed without adequate instructions or warnings of its potential for harm." *Hufft v. Horowitz*, 4 Cal.App.4th 8, 13, 5 Cal.Rptr.2d 377 (1992) (citing *Barker v. Lull Eng'g Co.*, 20 Cal.3d 413, 428, 143 Cal.Rptr. 225, 573 P.2d 443

---

4. Defendant contends that the ruling in *Georges* is based on a misinterpretation of *Ingram v. Novartis Pharmaceuticals Corp.*, 888 F.Supp.2d 1241, (W.D.Okl.2012) because it states that a plaintiff can avoid summary judgment by demonstrating changes in prescribing practices if such changes "may have" prevented the injury, rather than "would have" prevented the injury. (MSJ at 11.)

The Court disagrees that *Georges* is based on a misinterpretation of *Ingram*. At the summary judgment stage, in order to defeat summary judgment, the non-moving party's burden is to demonstrate that there is a genuine issue of material fact to be resolved at trial. Fed. R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505.

(1978)). However, "California courts have found an 'exception' to the . . . general rule of strict liability when it comes to prescription drugs." *Tucker v. Wright Medical Technology, Inc.*, No. 11–3086, 2013 WL 1149717, at *4 (N.D.Cal. March 19, 2013) (citing *Hufft v. Horowitz*, 4 Cal.App.4th 8, 13, 5 Cal.Rptr.2d 377 (1992)). In *Brown v. Superior Court*, 44 Cal.3d 1049, 245 Cal. Rptr. 412, 751 P.2d 470 (1988), the California Supreme Court held that "a drug manufacturer's liability for a defectively designed drug should not be measured by the standards of strict liability," and the appropriate test for determining responsibility is the test stated in the Restatement Second of Torts § 402A, Comment k.[5] 44 Cal.3d at 1061, 245 Cal.Rptr. 412, 751 P.2d 470. Therefore, "a manufacturer is not strictly liable for injuries caused by a prescription drug so long as the drug was properly prepared and accompanied by warnings of its dangerous propensities that were either known or reasonably scientific knowable at the time of distribution." *Id.* at 1069, 245 Cal.Rptr. 412, 751 P.2d 470.

■ Plaintiff provides no support for her contention that the strict liability design defect claim should survive summary judgment. The cases Plaintiff cites in her brief only address claims for negligent design defect. *See In re Aredia and Zometa Products Liability Litigation*, No. 06–0550, 2009 WL 2497692 (M.D.Tenn. Aug. 13, 2009); *Torres v. Taser Int'l, Inc.*, 277 Fed.Appx. 684 (9th Cir.2008). Additionally, Plaintiff only argues that there is a genuine issue of material fact because it was foreseeable that Defendant should monitor the mouth in clinical trials, and there is evidence that a lower dose of the drug would be possible. (Opp. at 18.) Plaintiff has not argued or presented evidence that Aredia or Zometa were not properly prepared or accompanied by the appropriate warnings that were known or knowable at the time of distribution.

Thus, the Court GRANTS Defendant's MSJ as to Plaintiff's claim for strict liability based on design defect.[6]

#### 4. Implied Warranty Claim

■ Defendant asserts that summary judgment is appropriate on Plaintiff's breach of implied warranty claim because privity of contract is required to recover on a claim for breach of implied warranty, and there is no evidence that there was privity between the Parties. (MSJ at 15–16.) "California law once provided that privity of contract was necessary in

---

**5.** Comment k provides: *"Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. . . . Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. . . . The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk."

**6.** Defendant appears to argue in its Reply that summary judgment is appropriate on Plaintiff's negligent design defect claim. (Reply iso MSJ at 6–7.) This argument was not made in the moving papers and the Court does not consider it. *See U.S. ex rel. Giles v. Sardie*, 191 F.Supp.2d 1117, 1127 (C.D.Cal.2000) ("It is improper for a moving party to introduce new facts or different legal arguments in the reply brief than those presented in the moving papers.")

an action for breach of either express or implied warranty and that no privity existed between the original seller and a subsequent purchaser unconnected to the original sale. California courts have since recognized an exception to the privity requirement in numerous cases involving foodstuffs, and then more recently, drugs." *Quatela v. Stryker Corp.,* 820 F.Supp.2d 1045, 1047 (N.D.Cal.2010) (citing *Burr v. Sherwin Williams Co.,* 42 Cal.2d 682, 695, 268 P.2d 1041 (1954) and *Gottsdanker v. Cutter Laboratories,* 182 Cal.App.2d 602, 606–607, 6 Cal.Rptr. 320 (1960)). In *Gottsdanker v. Cutter Laboratories,* the Court of Appeal, applying an exception for food products, held that "the absence of privity does not bar recovery on implied warranty from the manufacturer of the vaccine [at issue]." 182 Cal.App.2d 602, 607, 6 Cal.Rptr. 320 (1960); *Arnold v. Dow Chem. Co.,* 91 Cal. App.4th 698, 720, 110 Cal.Rptr.2d 722 (2001) ("An exception to the general rule has been recognized in the case of foodstuffs, and has been extended to drugs, on the basis that a drug is intended for human consumption quite as much as is food."); *Windham at Carmel Mountain Ranch Assn. v. Superior Court,* 109 Cal. App.4th 1162, 1169, 135 Cal.Rptr.2d 834 (2003) ("Exceptions to the privity requirement have been established in cases involving foodstuffs, drugs and pesticides."). Defendant cites to several cases to support that privity is required for implied warranty claims involving pharmaceuticals or other medical products that have been introduced into a patient's body. (MSJ at 15 n. 4.) However, all the cases Defendant cites involve implanted medical devices. At least one court has acknowledged a difference in the privity requirement for drugs and implanted medical devices. *See Quatela,* 820 F.Supp.2d at 1047. Thus, the Court finds that a lack of privity is not a bar to Plaintiff's breach of implied warranty claim and the Court DENIES Defendant's MSJ on this claim.

### 5. Pamidronate Infusions

Defendant asserts that Plaintiff should be precluded from holding Defendant liable for "certain pamidronate infusions because she cannot satisfy her product identification burden of proving that the infusions were name brand Aredia sold by NPC, as opposed to another company's generic pamidronate." (MSJ at 16.) Defendant argues that Plaintiff has no evidence to prove that the pamidronate she received from February 2005 until January 2009 were Aredia infusions. (*Id.*) Plaintiff only cursorily responds in her Introduction that "[w]hen specifically she allegedly began taking the generic pamidronate versus … Aredia is a disputed fact for the jury to decide." (Opp. at 8.)

■ The Court finds that there is a genuine dispute of material fact as to whether Plaintiff took Aredia or a generic pamidronate from February 2005 until January 2009. Dr. Nakamura's Clinic Notes from this time period refer to Aredia (*see* Clinic Notes, Girardi Decl., Exs. 6–8), and his testimony that this could have referred to a generic pamidronate creates a genuine dispute. While Defendant presents evidence that the market share of Aredia dropped and Dr. Nakamura did not specifically push for the use of name brand Aredia during the relevant time period, the Court finds that this evidence does not satisfy Defendant's burden of demonstrating an absence of a genuine issue of material fact.

Thus, the Court DENIES Defendant's MSJ to preclude Plaintiff from seeking to hold Defendant liable for the pamidronate infusions from February 2005 until January 2009.

### 6. Punitive Damages

Defendant argues that the Court should apply New Jersey law to Plaintiff's request for punitive damages. (MSJ at 17–25.) Plaintiff alleges in the Complaint that she is a resident of California, and she received all infusions of Aredia and Zometa in California. (Compl. ¶ 2.) Defendant's principal place of business is in New Jersey. (*Id.* ¶ 3.)

***Punitive Damages Under California and New Jersey Law***

■ In determining the applicable substantive law, the Court first determines whether the applicable laws are materially different. The Court finds that the applicable laws of California and New Jersey differ materially as to punitive damages. In California, punitive damages are available in any action for breach of a non-contractual obligation, including products liability actions, "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ.Code § 3294(a); *see Grimshaw v. Ford Motor Co.*, 119 Cal.App.3d 757, 810, 174 Cal.Rptr. 348 (1981). Under California law, punitive damages in products liability actions are not statutorily limited, but must be sufficient to "deter future misconduct by the defendant" without being "so disproportionate to the defendant's ability to pay that the award is excessive." *Adams v. Murakami*, 54 Cal.3d 105, 110–12, 284 Cal. Rptr. 318, 813 P.2d 1348 (1991).

Under the New Jersey Punitive Damages Act, punitive damages are available if the plaintiff proves, "by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions." N.J. Stat. Ann.

§ 2A:15–5.12. However, punitive damages are limited "in any action in an amount in excess of five times the liability of the defendant for compensatory damages or $350,000, whichever is greater." *Id.* § 2A:15–5.14. Additionally, the New Jersey Products Liability Act prohibits punitive damages where the drug at issue "was subject to premarket approval or licensure by the [FDA] ... and was approved or licensed." N.J. Stat. Ann. § 2A:58C–5.

The Parties do not dispute that Aredia and Zometa are FDA-approved drugs. Therefore, under New Jersey law, Plaintiff would be precluded from recovering punitive damages.

***Interests of Each Jurisdiction***

Because the applicable law on punitive damages differs materially, the Court turns to the interests of California and New Jersey in having its law applied to the dispute to determine whether there is a conflict. *See American Bank of Commerce v. Corondoni*, 169 Cal.App.3d 368, 372, 215 Cal.Rptr. 331 (1985) ("If the interests of the foreign state will not be significantly furthered by applying its law, the California court must conclude that the conflict is 'false' and apply California law."); *Washington Mutual Bank, FA v. Superior Court*, 24 Cal.4th 906, 920, 103 Cal.Rptr.2d 320, 15 P.3d 1071 (2001).

■ California's punitive damages law advances the state's legitimate interest in punishing and deterring conduct harmful to its residents. *See Simon v. San Paolo U.S. Holding Co., Inc.*, 35 Cal.4th 1159, 1185, 29 Cal.Rptr.3d 379, 113 P.3d 63 (2005). Similarly, New Jersey recognizes the purpose of punitive damages as being "the deterrence of egregious misconduct and the punishment of the offender." *Herman v. Sunshine Chemical Specialties, Inc.*, 133 N.J. 329, 337, 627 A.2d 1081 (1993). However, New Jersey's law "lim-

its the liability of manufacturers of FDA-approved products by reducing the burden placed on them by product liability litigation. The Legislature carefully balanced the need to protect individuals against the need to protect an industry with significant relationship to [New Jersey's] economy and public health." *Rowe v. Hoffman–La Roche, Inc.*, 189 N.J. 615, 623–24, 917 A.2d 767 (2007).

The Court finds that there is a true conflict because California has an interest in applying its punitive damages law to punish and deter misconduct, while New Jersey has an interest in limiting the liability of businesses that operate within its borders.

### Comparative Impairment Analysis

When both states have a legitimate interest in the application of its law, such that a true conflict exists, the court employs a "comparative impairment" analysis "to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state." *Denham v. Farmers Ins. Co.*, 213 Cal. App.3d 1061, 1066, 262 Cal.Rptr. 146 (1989). In undertaking the comparative impairment analysis, the court "must determine 'the relative commitment of the respective states to the laws involved' and consider 'the history and current status of the states' laws'" and "the function and purpose of those laws." *Wa. Mut. Bank*, 24 Cal.4th at 920, 103 Cal.Rptr.2d 320, 15 P.3d 1071 (quoting *Offshore Rental Co. v. Continental Oil Co.*, 22 Cal.3d 157, 166, 148 Cal.Rptr. 867, 583 P.2d 721 (1978)).

 In California, the availability of punitive damages predates their codification in California Civil Code § 3294, and the policies underlying punitive damages, punishment and deterrence, are held strongly today. *See Wilson v. Middleton*, 2 Cal. 54, 54–56 (1852); *Roby v. McKesson Corp.*, 47 Cal.4th 686, 719–20, 101 Cal.

Rptr.3d 773, 219 P.3d 749 (2009). In New Jersey, the policies underlying the law regarding punitive damages, including the intention to limit the liability of manufacturers of FDA-approved products, are also strongly held today. *See Kendall v. Hoffman–La Roche, Inc.*, 209 N.J. 173 (2012).

 The Court agrees with Judge Ishii's reasoning in *Hill v. Novartis Pharmaceutical Corp.*, finding that California's interest would be significantly impaired if New Jersey law were to apply here. No. 06–0939, 2012 WL 967577 (E.D.Cal. March 21, 2012). Defendant markets and distributes Zometa and Aredia in California, and "California has an interest in regulating the conduct of manufacturers who, like Defendant, have allegedly placed their products into California's stream of commerce with actual knowledge of a defect. To preclude the application of California's punitive damages law where such products have injured California residents in California would necessarily defeat this interest, as it would allow manufacturers to do business in the state while preventing the state from punishing or deterring misconduct committed within its borders." *Id.* at *10.

Thus, the Court DENIES Defendant's MSJ on the issue of punitive damages. The Court will apply California's punitive damages law in this action.

### V. CONCLUSION

For the foregoing reasons, the Court:

1) GRANTS IN PART and DENIES IN PART Defendant's Motion to Exclude Testimony of Plaintiff's Case-Specific Experts;

2) REOPENS discovery solely to allow Defendant to take an additional deposition of Dr. Sung on the subject of his examination of Plaintiff and Consultation Report;

3) DENIES IN PART Defendant's Motion for a *Daubert* Evidentiary Hearing; and

4) GRANTS IN PART and DENIES IN PART Defendant's Motion for Summary Judgment.