[S.F. No. 23242. In Bank. Mar. 2, 1976.]

RICHARD A. BERNHARD, Plaintiff and Appellant, v.
HARRAH'S CLUB, Defendant and Respondent.

## COUNSEL

Frederick W. Stephenson for Plaintiff and Appellant.

Hardy, Erich & Brown and Leo H. Schuering, Jr., for Defendant and Respondent.

Robert List, Attorney General (Nevada), James H. Thompson, Chief Deputy Attorney General, and John H. Garvin as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**SULLIVAN, J.**—Plaintiff appeals from a judgment of dismissal entered upon an order sustaining without leave to amend the general demurrer of defendant Harrah's Club to plaintiff's first amended complaint.

Plaintiff's complaint, containing only one count, alleged in substance the following: Defendant Harrah's Club, a Nevada corporation, owned and operated gambling establishments in the State of Nevada in which intoxicating liquors were sold, furnished to the public and given away for consumption on the premises. Defendant advertised for and solicited in California the business of California residents at such establishments knowing and expecting that many California residents would use the public highways in going to and from defendant's drinking and gambling establishments.

On July 24, 1971, Fern and Philip Myers, in response to defendant's advertisements and solicitations, drove from their California residence to defendant's gambling and drinking club in Nevada, where they stayed until the early morning hours of July 25, 1971. During their stay, the Myers were served numerous alcoholic beverages by defendant's employees, progressively reaching a point of obvious intoxication rendering them incapable of safely driving a car. Nonetheless defendant continued to serve and furnish the Myers alcoholic beverages.

While still in this intoxicated state, the Myers drove their car back to California. Proceeding in a northeasterly direction on Highway 49, near Nevada City, California, the Myers' car, driven negligently by a still intoxicated Fern Myers, drifted across the center line into the lane of oncoming traffic and collided head-on with plaintiff Richard A. Bernhard, a resident of California, who was then driving his motorcycle along said highway. As a result of the collision plaintiff suffered severe injuries. Defendant's sale and furnishing of alcoholic beverages to the Myers, who were intoxicated to the point of being unable to drive safely, was negligent and was the proximate cause of the plaintiff's injuries in the ensuing automobile accident in California for which plaintiff prayed $100,000 in damages.

Defendant filed a general demurrer to the first amended complaint. In essence it was grounded on the following contentions: that Nevada law denies recovery against a tavern keeper by a third person for injuries proximately caused by the former by selling or furnishing alcoholic beverages to an intoxicated patron who inflicts the injuries on the latter; that Nevada law governed since the alleged tort was committed by defendant in Nevada; and that section 25602 of the California Business and Professions Code which established the duty necessary for liability under our decision in *Vesely* v. *Sager* (1971) 5 Cal.3d 153 [95 Cal.Rptr. 623, 486 P.2d 151], was inapplicable to a Nevada tavern. The trial court sustained the demurrer without leave to amend and entered a judgment of dismissal. This appeal followed.

■ We face a problem in the choice of law governing a tort action. As we have made clear on other occasions, we no longer adhere to the rule that the law of the place of the wrong is applicable in a California forum regardless of the issues before the court. (*Hurtado* v. *Superior Court* (1974) 11 Cal.3d 574, 579 [114 Cal.Rptr. 106, 522 P.2d 666]; *Reich* v. *Purcell* (1967) 67 Cal.2d 551, 555 [63 Cal.Rptr. 31, 432 P.2d 727].) Rather we have adopted in its place a rule requiring an analysis of the respective interests of the states involved—the objective of which is " 'to determine the law that most appropriately applies to the issue involved.' " (*Hurtado, supra,* at pp. 579-580, quoting from *Reich, supra,* at p. 555.)

The issue involved in the case at bench is the civil liability of defendant tavern keeper to plaintiff, a third person, for injuries allegedly caused by the former by selling and furnishing alcoholic beverages in Nevada to intoxicated patrons who subsequently injured plaintiff in

California. Two states are involved: (1) California—the place of plaintiff's residence and domicile, the place where he was injured, and the forum; and (2) Nevada—the place of defendant's residence and the place of the wrong.

We observe at the start that the laws of the two states—California and Nevada—applicable to the issue involved are not identical. California imposes liability on tavern keepers in this state for conduct such as here alleged. In *Vesely* v. *Sager, supra,* 5 Cal.3d 153, 166, this court rejected the contention that "civil liability for tavern keepers should be left to future legislative action . . . . First, liability has been denied in cases such as the one before us solely because of the judicially created rule that the furnishing of alcoholic beverages is not the proximate cause of injuries resulting from intoxication. As demonstrated, *supra,* this rule is patently unsound and totally inconsistent with the principles of proximate cause established in other areas of negligence law. . . . Second, the Legislature has expressed its intention in this area with the adoption of Evidence Code section 669, and Business and Professions Code section 25602. . . . It is clear that Business and Professions Code section 25602 [making it a misdemeanor to sell to an obviously intoxicated person] is a statute to which this presumption [of negligence, Evidence Code section 669] applies and that the policy expressed in the statute is to promote the safety of the people of California . . . ." Nevada on the other hand refuses to impose such liability. In *Hamm* v. *Carson City Nuggett, Inc.* (1969) 85 Nev. 99 [450 P.2d 358, 359], the court held it would create neither common law liability nor liability based on the criminal statute banning sale of alcoholic beverages to a person who is drunk, because "if civil liability is to be imposed, it should be accomplished by legislative act after appropriate surveys, hearings, and investigations to ascertain the need for it and the expected consequences to follow." It is noteworthy that in *Hamm* the Nevada court in relying on the common law rule denying liability cited our decision in *Cole* v. *Rush* (1955) 45 Cal.2d 345 [289 P.2d 450, 54 A.L.R.2d 1137], later overruled by us in *Vesely* to the extent that it was inconsistent with that decision. (See *Vesely* v. *Sager, supra,* 5 Cal.3d at p. 167.)

Although California and Nevada, the two "involved states" (*Reich* v. *Purcell, supra,* 67 Cal.2d 551, 553; see also *Hurtado* v. *Superior Court, supra,* 11 Cal.3d 574, 579), have different laws governing the issue presented in the case at bench, we encounter a problem in selecting the applicable rule of law only if *both* states have an interest in having their respective laws applied. ■ "[G]enerally speaking the forum will

apply its own rule of decision unless a party litigant timely invokes the law of a foreign state. In such event he must demonstrate that the latter rule of decision will further the interest of the foreign state and therefore that it is an appropriate one for the forum to apply to the case before it. [Citations.]" (*Hurtado, supra,* at p. 581.)

Defendant contends that Nevada has a definite interest in having its rule of decision applied in this case in order to protect its resident tavern keepers like defendant from being subjected to a civil liability which Nevada has not imposed either by legislative enactment or decisional law. It is urged that in *Hamm* v. *Carson City Nuggett, supra,* 450 P.2d 358, 359, the Supreme Court of Nevada clearly delineated the policy underlying denial of civil liability of tavern keepers who sell to obviously intoxicated patrons: "Those opposed to extending liability point out that to hold otherwise would subject the tavern owner to ruinous exposure every time he poured a drink and would multiply litigation endlessly in a claim-conscious society. Every liquor vendor visited by the patron who became intoxicated would be a likely defendant in subsequent litigation flowing from the patron's wrongful conduct. . . . Judicial restraint is a worthwhile practice when the proposed new doctrine may have implications far beyond the perception of the court asked to declare it. They urge that if civil liability is to be imposed, it should be accomplished by legislative act after appropriate surveys, hearings, and investigations . . . . We prefer this point of view." Accordingly defendant argues that the Nevada rule of decision is the appropriate one for the forum to apply.

Plaintiff on the other hand points out that California also has an interest in applying its own rule of decision to the case at bench. California imposes on tavern keepers civil liability to third parties injured by persons to whom the tavern keeper has sold alcoholic beverages when they are obviously intoxicated "for the purpose of protecting members of the general public from injuries to person and damage to property resulting from the excessive use of intoxicating liquor." (*Vesely* v. *Sager, supra,* 5 Cal.3d 153, 165.) California, it is urged, has a special interest in affording this protection to all California residents injured in California.

■ Thus, since the case at bench involves a California resident (plaintiff) injured in this state by intoxicated drivers and a Nevada resident tavern keeper (defendant) which served alcoholic beverages to them in Nevada, it is clear that each state has an interest in the application of its respective law of liability and nonliability. It goes

without saying that these interests conflict. Therefore, unlike *Reich* v. *Purcell, supra,* 67 Cal.2d 551, and *Hurtado* v. *Superior Court, supra,* 11 Cal.3d 574, where we were faced with "false conflicts," in the instant case for the first time since applying a governmental interest analysis as a choice of law doctrine in *Reich,* we are confronted with a "true" conflicts case. We must therefore determine the appropriate rule of decision in a controversy where each of the states involved has a legitimate but conflicting interest in applying its own law in respect to the civil liability of tavern keepers.

The search for the proper resolution of a true conflicts case, while proceeding within orthodox parameters of governmental interest analysis, has generated much scholarly examination and discussion.[1] The father of the governmental interest approach,[2] Professor Brainerd Currie, originally took the position that in a true conflicts situation the law of the forum should always be applied. (Currie, Selected Essays on

---

[1]Baxter, *Choice of Law and the Federal System* (1963) 16 Stan.L.Rev. 1; Cavers, The Choice of Law Process (1965) pages 114-224; Horowitz, *The Law of Choice of Law in California-A Restatement* (1974) 21 UCLA L.Rev. 719, 748-758; *Conflict of Laws Round Table: A Symposium* (1972) 57 Iowa L.Rev. 1219-1270; *Symposium, Conflict of Laws Round Table* (1971) 49 Texas L.Rev. 211-245; Sedler, *Reviews-Conflicts Commentary* (1972) 50 Texas L.Rev. 1064-1083; Weintraub, Commentary on the Conflict of Laws (1971). We note that no case has been called to our attention, nor are we aware of one, which has discussed this problem in a context relevant to the case at bench.

[2]Traditionally the search for choice of law rules focused upon the interests of the immediate parties to the action in terms of their private rights. Thus, it concentrated "upon the same factors that would be dispositive in a similar case wholly internal to a single state. I cannot escape the conclusion that a search so oriented must prove unrewarding. Every choice-of-law case involves several parties, each of whom would prevail if the internal law of one rather than another state were applied. Each party is 'right,' 'worthy,' and 'deserving' and 'ought in all fairness' to prevail under one of the competing bodies of law and in the view of one of the competing groups of lawmakers. Fact situations which differ only in that they are internal to a single state have been assessed by the different groups of lawmakers, and each has reached a different value judgment on the rule best calculated to serve the overall interest of its community. If attention is confined to the circumstances of the immediate parties, the conflict between the internal laws and between the value judgments they are intended to implement cannot be resolved by the judge unless he is prepared to impose still another value judgment upon the controversy. . . . [¶] These difficulties can be avoided if normative criteria can be found which relate to the very aspects of a conflicts case that distinguish it from an analogous internal case. That such criteria can be elaborated in many, if not all, conflicts cases has been demonstrated by several writers who have urged that conflicts cases be resolved on the basis of the governmental interests involved. . . . [¶] [T]he process of resolving choice cases is necessarily one of allocating spheres of legal control among states. His [Professor Currie] thesis, like mine, is that the process of allocation should not be performed unconsciously, that the private interests in choice cases are necessarily in balance, and that the cases can be decided by viewing them as instances of conflicting states interests rather than of conflicting private interests." (Baxter, *Choice of Law and the Federal System, supra,* 16 Stan.L.Rev. 1, 5, 6, 22, fn. omitted.)

Conflicts of Laws (1963) p. 184.) However, upon further reflection, Currie suggested that when under the governmental interest approach a preliminary analysis reveals an apparent conflict of interest upon the forum's assertion of its own rule of decision, the forum should reexamine its policy to determine if a more restrained interpretation of it is more appropriate. "[T]o assert a conflict between the interests of the forum and the foreign state is a serious matter; the mere fact that a suggested broad conception of a local interest will create conflict with that of a foreign state is a sound reason why the conception should be reexamined, with a view to a more moderate and restrained interpretation both of the policy and of the circumstances in which it must be applied to effectuate the forum's legitimate purpose. . . . An analysis of this kind . . . was brilliantly performed by Justice Traynor in *Bernkrant v. Fowler* (1961) 55 Cal.2d 588 [12 Cal.Rptr. 266, 360 P.2d 906]." (Currie, *The Disinterested Third State* (1963) 28 Law & Contemp. Prob., pp. 754, 757; see also Sedler in *Symposium, Conflict of Laws Round Table, supra,* 49 Texas L.Rev. 211, at pp. 224-225.) This process of reexamination requires identification of a "real interest as opposed to a hypothetical interest" on the part of the forum (Sedler, *Value of Principled Preferences,* 49 Texas L.Rev. 224) and can be approached under principles of "comparative impairment." (Baxter, *Choice of Law and the Federal System, supra,* 16 Stan.L.Rev. 1-22; Horowitz, *The Law of Choice of Law in California—A Restatement, supra,* 21 UCLA L.Rev. 719, 748-758.)

Once this preliminary analysis has identified a true conflict of the governmental interests involved as applied to the parties under the particular circumstances of the case, the "comparative impairment" approach to the resolution of such conflict seeks to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state. This analysis proceeds on the principle that true conflicts should be resolved by applying the law of the state whose interest would be the more impaired if its law were not applied. Exponents of this process of analysis emphasize that it is very different from a weighing process. The court does not " 'weigh' the conflicting governmental interests in the sense of determining which conflicting law manifested the 'better' or the 'worthier' social policy on the specific issue. An attempted balancing of conflicting state policies in that sense . . . is difficult to justify in the context of a federal system in which, within constitutional limits, states are empowered to mold their policies as they wish. . . . [The process] can accurately be described as . . . accommodation of conflicting state policies, as a problem of allocating domains of law-making power in multi-state contexts—limitations on the reach of

state policies—as distinguished from evaluating the wisdom of those policies. . . . [E]mphasis is placed on the appropriate scope of conflicting state policies rather than on the 'quality' of those policies . . . ." (Horowitz, *The Law of Choice of Law in California—A Restatement, supra,* 21 UCLA L.Rev. 719, 753; see also Baxter, *Choice of Law and the Federal System, supra,* 16 Stan.L.Rev. 1, 18-19.) However, the true function of this methodology can probably be appreciated only casuistically in its application to an endless variety of choice of law problems. (See, e.g., the hypothetical situations set forth in *Baxter, op. cit.,* pp. 10-17.)

Although the concept and nomenclature of this methodology may have received fuller recognition at a later time, it is noteworthy that the core of its rationale was applied by Justice Traynor in his opinion for this court in *People* v. *One 1953 Ford Victoria* (1957) 48 Cal.2d 595 [311 P.2d 480]. There in a proceeding to forfeit an automobile for unlawful transportation of narcotics we dealt with the question whether a chattel mortgage of the vehicle given in Texas and, admittedly valid both in that state and this, succumbed to the forfeiture proceedings. The purchaser of the car, having executed a note and chattel mortgage for the unpaid purchase price, without the consent of the mortgagee drove the vehicle to California where he used it to transport marijuana. Applicable California statutes made it clear that they did not contemplate the forfeiture of the interest of an innocent mortgagee, that is a person whose "interest was created after a reasonable investigation of the moral responsibility, character and reputation of the purchaser and without any knowledge that the vehicle was being, or was to be, used for the purpose charged . . . ." Texas had no similar statute; nor had the mortgagee, though proving that the mortgage was bona fide, also proved that he had made the above reasonable investigation of the mortgagor.

It was clear that Texas had an interest in seeing that valid security interests created upon the lawful purchase of automobiles in Texas be enforceable and recognized. California had an interest in controlling the transportation of narcotics. Each interest was .at stake in the case, since the chattel mortgage had been validly created in Texas and the car was used to transport narcotics in California. The crucial question confronting the court was whether the "reasonable investigation" required by statute of a California mortgagee applied to the Texas mortgagee. Employing what was in substance a "comparative impairment" approach, the court answered the question in the negative. "It is contended that a holding that the 'reasonable investigation' requirement is not

applicable to respondent will subvert the enforcement of California's narcotics laws. We are not persuaded that such dire consequences will ensue. The state may still forfeit the interest of the wrongdoer. It has done so in this case. Moreover, the Legislature has made plain its purpose not to forfeit the interests of innocent mortgagees. It has not made plain that 'reasonable investigation' of the purchaser is such an essential element of innocence that it must be made even by an out-of-state mortgagee although such mortgagee could not reasonably be expected to make such investigation." (*Id.,* at p. 599.)

Mindful of the above principles governing our choice of law, we proceed to reexamine the California policy underlying the imposition of civil liability upon tavern keepers. At its broadest limits this policy would afford protection to all persons injured in California by intoxicated persons who have been sold or furnished alcoholic beverages while intoxicated regardless of where such beverages were sold or furnished. Such a broad policy would naturally embrace situations where the intoxicated actor had been provided with liquor by out-of-state tavern keepers. Although the State of Nevada does not impose such *civil* liability on its tavern keepers, nevertheless they are subject to *criminal* penalties under a statute making it unlawful to sell or give intoxicating liquor to any person who is drunk or known to be an habitual drunkard. (See Nev. Rev. Stats. 202.100; see *Hamm* v. *Carson City Nuggett, Inc., supra,* 450 P.2d 358.)

We need not, and accordingly do not here determine the outer limits to which California's policy should be extended, for it appears clear to us that it must encompass defendant, who as alleged in the complaint, "advertis[es] for and otherwise solicit[s] in California the business of California residents at defendant HARRAH's CLUB Nevada drinking and gambling establishments, knowing and expecting said California residents, in response to said advertising and solicitation, to use the public highways of the State of California in going and coming from defendant HARRAH's CLUB Nevada drinking and gambling establishments." Defendant by the course of its chosen commercial practice has put itself at the heart of California's regulatory interest, namely to prevent tavern keepers from selling alcoholic beverages to obviously intoxicated persons who are likely to act in California in the intoxicated state. It seems clear that California cannot reasonably effectuate its policy if it does not extend its regulation to include out-of-state tavern keepers such as defendant who regularly and purposely sell intoxicating beverages to California residents in places and under conditions in which it is

reasonably certain these residents will return to California and act therein while still in an intoxicated state. California's interest would be very significantly impaired if its policy were not applied to defendant.

Since the act of selling alcoholic beverages to obviously intoxicated persons is already proscribed in Nevada, the application of California's rule of civil liability would not impose an entirely new duty requiring the ability to distinguish between California residents and other patrons. Rather the imposition of such liability involves an increased economic exposure, which, at least for businesses which actively solicit extensive California patronage, is a foreseeable and coverable business expense. Moreover, Nevada's interest in protecting its tavern keepers from civil liability of a boundless and unrestricted nature will not be significantly impaired when as in the instant case liability is imposed only on those tavern keepers who actively solicit California business.[3]

Therefore, upon reexamining the policy underlying California's rule of decision and giving such policy a more restrained interpretation for the purpose of this case pursuant to the principles of the law of choice of law discussed above, we conclude that California has an important and abiding interest in applying its rule of decision to the case at bench, that the policy of this state would be more significantly impaired if such rule were not applied and that the trial court erred in not applying California law.

Defendant argues, however, that even if California law is applied, the demurrer was nonetheless properly sustained because the tavern keeper's duty stated in *Vesely* v. *Sager, supra,* 5 Cal.3d 153, is based on Business and Professions Code section 25602, which is a criminal statute and thus without extraterritorial effect. It is quite true, as defendant argues, that in

---

[3]Defendant asserts that Nevada's law must be applied because it is the law of the place of sale and cites three cases in support of that proposition, *Trapp* v. *4-10 Investment Corporation* (8th Cir. 1970) 424 F.2d 1261; *Zucker* v. *Vogt* (D.Conn 1961) 200 F. Supp. 340; and *Schmidt* v. *Driscol Hotel* (1957) 82 N.W.2d 365. It is true that all three cases applied the law of the place of sale of the alcohol, but not for that reason. In *Trapp* and *Zucker* all the states involved had dram shop acts which would permit civil liability and the federal courts determined that the applicable forum state would give effect to the common policy of liability for sale to intoxicated persons regardless of traditional tort conflict rules. *Schmidt* is the only case where one state, Wisconsin, did not have a dram shop act and the other state, Minnesota, did. However, in that case even though the injury occurred in Wisconsin, the alcohol was sold and consumed in Minnesota and all the parties involved were from Minnesota. Moreover, none of these cases involved a case of true conflict between two state interests where the court endeavored to resolve the conflict by resort to the principles of governmental interest analysis. They are therefore inapposite.

*Vesely* we determined "that civil liability results when a vendor furnishes alcoholic beverages to a customer in violation of Business and Professions Code section 25602 and each of the conditions set forth in Evidence Code section 669, subdivision (a), is established." (5 Cal.3d at p. 157.)

It is also clear, as defendant's argument points out, that since, unlike the California vendor in *Vesely,* defendant was a Nevada resident which furnished the alcoholic beverage to the Myers in that state, the above California statute had no extraterritorial effect and that civil liability could not be posited on defendant's violation of a California criminal law. We recognize, therefore, that we cannot make the same determination as quoted above with respect to defendant that we made with respect to the defendant vendor in *Vesely.*

However, our decision in *Vesely* was much broader than defendant would have it. There, at the very outset of our opinion, we declared that the traditional common law rule denying recovery on the ground that the furnishing of alcoholic beverage is not the proximate cause of the injuries inflicted on a third person by an intoxicated individual "is patently unsound." (5 Cal.3d at p. 157.) Observing that "[u]ntil fairly recently, it was uniformly held that [such] an action could not be maintained at common law" (*id.,* at p. 158) and reviewing in detail the common law rule (*id.,* at pp. 158-164) we concluded that "the furnishing of an alcoholic beverage to an intoxicated person may be a proximate cause of injuries inflicted by that individual upon a third person." We reasoned: "If such furnishing is a proximate cause, it is so because the consumption, resulting intoxication, and injury-producing conduct are foreseeable intervening causes, or at least the injury-producing conduct is one of the hazards which makes such furnishing negligent." (*Id.,* at p. 164.)

Proceeding to the question of the tavern keeper's duty in this respect and rejecting his contention that civil liability for tavern keepers should be left to future legislative action, we noted that "liability has been denied in cases such as the one before us solely because of the judicially created rule that the furnishing of alcoholic beverages is not the proximate cause of injuries resulting from intoxication. As demonstrated, *supra,* this rule is patently unsound and totally inconsistent with the principles of proximate cause established in other areas of negligence law. Other common law tort rules which were determined to be lacking in validity have been abrogated by this court (see *Gibson* v. *Gibson* (1971) 3 Cal.3d 914 [92 Cal.Rptr. 288, 479 P.2d 648]; *Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211 [11 Cal.Rptr. 89, 359 P.2d 457]), and

there is no sound reason for retaining the common law rule presented in this case." (5 Cal.3d at p. 166.)

In sum, our opinion in *Vesely* struck down the old common law rule of nonliability constructed on the basis that the consumption, not the sale, of alcoholic beverages was the proximate cause of the injuries inflicted by the intoxicated person. Although we chose to impose liability on the *Vesely* defendant on the basis of his violating the applicable statute, the clear import of our decision was that there was no bar to civil liability under modern negligence law. Certainly, we said nothing in *Vesely* indicative of an intention to retain the former rule that an action at common law does not lie. The fact then, that in the case at bench, section 25602 of the Business and Professions Code is not applicable to this defendant in Nevada so as to warrant the imposition of civil liability on the basis of its violation, does not preclude recovery on the basis of negligence apart from the statute. Pertinent here is our observation in *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 118-119 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496]: "It bears repetition that the basic policy of this state set forth by the Legislature in section 1714 of the Civil Code is that everyone is responsible for an injury caused to another by his want of ordinary care or skill in the management of his property."

The judgment is reversed and the cause is remanded to the trial court with directions to overrule the demurrer and to allow defendant a reasonable time within which to answer.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Clark, J., and Molinari, J.,* concurred.

Respondent's petition for a rehearing was denied April 22, 1976. Richardson, J., did not participate therein.

---

*Assigned by the Chairman of the Judicial Council.