**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| DAVID CASSIRER; THE ESTATE OF AVA CASSIRER; UNITED JEWISH FEDERATION OF SAN DIEGO COUNTY, a California non-profit corporation, | No. 19-55616 |
| | D.C. No. 2:05-cv-03459-JFW-E |
| *Plaintiffs-Appellants*, | |
| v. | ORDER |
| THYSSEN-BORNEMISZA COLLECTION FOUNDATION, an agency or instrumentality of the Kingdom of Spain, | |
| *Defendant-Appellee*. | |

Filed July 9, 2024

Consuelo M. Callahan, Carlos T. Bea, and Sandra S. Ikuta, Circuit Judges.

Order;
Statement by Judge Graber

# SUMMARY[*]

## Foreign Sovereign Immunities Act

The panel filed an order denying a petition for panel rehearing and denying a petition for rehearing en banc in a case in which the panel affirmed the district court's judgment in favor of the Thyssen-Bornemisza Collection, an instrumentality of the Kingdom of Spain, in an action under the Foreign Sovereign Immunities Act seeking the return of a Pissarro painting stolen by the Nazis in 1939 Germany.

Respecting the denial of rehearing en banc, Judge Graber, joined by Judge Paez, wrote that she regretted the denial of rehearing en banc because this case is exceptionally important, and it includes not only a legal component, but also a moral component. Judge Graber wrote that the court should reach the result that is both legally compelled and morally correct and should hold that, under California's choice-of-law test, California law, not Spanish law, applies.

# ORDER

The panel unanimously voted to deny the petition for panel rehearing. Judge Callahan and Judge Ikuta voted to deny the petition for rehearing en banc, and Judge Bea so recommended. The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35(a). Plaintiffs-Appellants' petition for panel rehearing and rehearing en banc, Dkt. 155, is **DENIED**.

Judges Owens, Friedland, and Collins did not participate in the deliberations or vote in this case.

---

GRABER, Senior Circuit Judge, with whom Senior Circuit Judge PAEZ joins, respecting the denial of rehearing en banc:

I regret this court's denial of rehearing en banc.

In 1939, Nazis stole a painting by Camille Pissarro from the Cassirers, a prominent Jewish family, in Germany. In 2000, the sole remaining heir, Claude Cassirer, discovered the painting in a Spanish museum that is an instrumentality of Spain. Spain refused to return the painting, and Claude filed this action against the museum's foundation ("TBC") in 2005.

The only remaining question before this court is whether, applying California's choice-of-law test, California law or Spanish law applies. We must ask, in the context of this particular dispute, which jurisdiction's interest in enforcing its laws would be more impaired by applying the other jurisdiction's law. That inquiry favors applying a new, specific, modern law that will frustrate the purpose of the other jurisdiction's law only minimally. The test disfavors applying an old, general, isolated law that will eviscerate the purpose of the other jurisdiction's law.

The answer here is clear: California's law applies. California's law is new (enacted in 2010), specific to the

recovery of stolen art, and consistent with nearly all domestic and international laws; and applying California's law will affect the purpose of Spain's law in only a tiny fraction of cases. By contrast, Spain's law is old (enacted in 1889); applies generally to all private property; and is isolated, contrary to the law of nearly all other jurisdictions, and contrary to Spain's own international commitments to return artwork stolen by Nazis. Finally, applying Spain's law would undermine entirely the purpose of California's law. The panel's opinion concludes that Spain's law applies by misstating the record about TBC's alleged "good faith" purchase of the painting, by applying principles that are inapposite, and by overlooking the relevance of the most important legal sources.

Questions of state law ordinarily do not warrant rehearing en banc. But this case is extraordinary. It has generated many decisions by the district court; seven published opinions by this court, including one by an en banc panel; and one unanimous published opinion by the Supreme Court reversing our earlier ruling in favor of TBC. In addition to generating significant judicial proceedings, the dispute has garnered intense media coverage and interest from all over the world. This also is the rare case that has not only a legal component, but also a moral component: Consistent with earlier statements by the district court and by the panel as a whole, Judge Callahan's concurrence states that the opinion's result is "at odds with [her] moral compass." Cassirer v. TBC, 89 F.4th 1226, 1246 (9th Cir. 2024) (Callahan, J., concurring).

The issue is critically important. The world is watching. We should reach the result that is both legally compelled and morally correct. I am deeply disappointed by this court's

decision, which has the unnecessary effect of perpetuating the harms caused by Nazis during World War II.

A.  California Law, Not Spanish Law, Applies.

California applies a three-step "governmental interest approach" to a conflict of laws. McCann v. Foster Wheeler LLC, 225 P.3d 516, 527 (Cal. 2010).  First, the court analyzes the laws of the two jurisdictions to see if the laws differ in the context of the case at issue. Id.  Second, the court "examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists." Id.  Third, the court "carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state."  Id. (citation and internal quotation marks omitted).

1.  California's Law and Spain's Law Differ.

Under California common law, adverse possession does not apply to personal property such as stolen artwork; thieves cannot pass good title; and the rightful owner can bring a claim for the specific recovery of personal property. Cassirer, 89 F.4th at 1235.  A claim for specific recovery is limited, however, by a statute of limitations found in California Code of Civil Procedure section 338.

For decades, section 338 specified a three-year statute of limitations.  In 2002, the California legislature enacted a special, extended statute of limitations specifically directed at artwork stolen by Nazis. See Cassirer v. TBC ("Cassirer II"), 737 F.3d 613, 616–17 (9th Cir. 2013) (describing the

history).[1]  In <u>Von Saher v. Norton Simon Museum of Art at Pasadena</u>, 578 F.3d 1016, 1026–30 (9th Cir. 2009), <u>as amended by</u> 592 F.3d 954 (9th Cir. 2010), we declared the statute of limitations unconstitutional on the ground of field preemption.    The California legislature then amended section 338 in 2010 to provide, for most claims seeking stolen works of fine art, a six-year statute of limitations, which starts to run only when the rightful owner discovers the personal property.  Cal. Civ. Proc. Code § 338(c)(3).  We upheld the constitutionality of that provision.  <u>Cassirer II</u>, 737 F.3d at 617–19.

In sum, California law permits a rightful owner to recover a stolen painting from a museum, but only if the owner sues within six years of discovering the painting. Here, no one disputes that the Cassirers are the rightful owners of the painting and that they brought the underlying action within six years of discovering the painting.  So if California law applies, the Cassirers prevail.

Spanish law differs.  Article 1955 of the Spanish Civil Code provides that a possessor of personal property gains title by adverse possession after "three years of uninterrupted possession in good faith" or "six years of uninterrupted possession, without any other condition."    The only exception is found in Article 1956, which provides a longer adverse-possession period (here, twenty-six years) for the criminals themselves—those who stole the property or had "actual knowledge" that it was stolen.  <u>See generally</u> <u>Cassirer v. TBC</u> ("<u>Cassirer III</u>"), 862 F.3d 951, 965–72 (9th

---

[1] For ease of reference, I follow the panel opinion's conventions in this case, both in the naming of the earlier opinions in this case and in referring to the plaintiffs as "the Cassirers."  <u>Cassirer</u>, 89 F.4th at 1229 n.2, 1230 n.4.

Cir. 2017).  In other words, the statute of limitations is three years for good-faith possession, six years for bad-faith non-criminal possession, or twenty-six years for criminal possession.  Here, the district court found that TBC did not have actual knowledge that the painting was stolen, and it is undisputed that TBC openly possessed the property "between 1993 and 1999, the relevant six-year period."  Id. at 965.  So if Spanish law applies, TBC prevails.

### 2.   A True Conflict Exists.

A true conflict exists because "both Spain and California have a legitimate interest in applying their respective laws on ownership of stolen personal property."  Cassirer, 89 F.4th at 1236 (quoting Cassirer v. TBC ("Cassirer VI"), 69 F.4th 554, 564 (9th Cir. 2023)) (brackets and internal quotation marks omitted).  Because the painting is presently located in Spain, Spain has an interest in applying its general property laws to assure Spanish possessors of title after the passage of time.  Id.  Because the Cassirers are Californian residents, California has an interest in applying its own property law to create certainty of title for its residents.  Id. "Moreover, California's 2010 enactment of § 338(c)(3)(A) evinces its 'strong interest in protecting the rightful owners of fine arts who are dispossessed of their property.'"  Id. (quoting Cassirer III, 862 F.3d at 963).

### 3.   California Law Applies at Step Three.

The answer in this case hinges on the final step of the analysis.  We "carefully evaluate[] and compare[] the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state."  McCann, 225 P.3d at 527 (citation and internal quotation marks omitted).  In making

that assessment, it is important to emphasize, as the panel's opinion did, two analytical points.  First, we must measure the interests of the two jurisdictions "based on 'the circumstances of the present case'—the facts of this particular dispute."  Cassirer, 89 F.4th at 1237 (quoting McCann, 225 P.3d at 534).  Second, the analysis does not ask "whether the Spanish rule or the California rule is the better or worthier rule."  Id. at 1236 (brackets omitted) (quoting McCann, 225 P.3d at 534).  Instead, we ask, as a factual matter, in the context of this particular dispute, which jurisdiction's interest would be more impaired by applying the other jurisdiction's law.  McCann, 225 P.3d at 534.  We apply "the law of the state whose interest would be more impaired if its law were not applied."  Id. at 527 (citation and internal quotation marks omitted).

Two factors, both independently and in combination, compel the conclusion that California law applies:  (a) the history and current status of Spain's and California's laws, and (b) the function and purpose of those laws.  Considering those two factors, we must determine (c) the relative impairment of Spain's and California's interests and policies.  The panel opinion errs in its application of those two factors, and it relies almost exclusively on a third factor that has no application here:  (d) the nonexistent conduct of the plaintiffs in Spain.

a.   History and Status of the Laws

The California Supreme Court has looked to "the history and current status of the states' laws."  Offshore Rental Co. v. Cont'l Oil Co., 583 P.2d 721, 727 (Cal. 1978).  A jurisdiction's interest in applying an "antique" or "archaic" law is weaker than a jurisdiction's interest in applying a more recent law addressing a more specific subject matter.

Id. at 726.  In two distinct ways, this factor weighs in favor of applying California's law.

California's law is the result of significant effort by the California legislature to address a specific, modern problem: the recovery of artwork stolen by Nazis.  As noted above, to address that problem, California enacted one law in 2002 and immediately enacted a replacement after we struck down the first law in 2010.  There is no doubt that California's law is the result of particularized attention to a modern problem, not application of an old law to a new problem.

By contrast, Spain's law is "antique," id.; it is a generally applicable property law enacted in the 19th century, and it has never been amended despite significant historical events such as the World Wars and the international consensus supporting the return of artwork stolen by Nazis.  The law appears to be a result of "the proverbial inertia of legal institutions."  Id. at 727.[2]

---

[2] In an earlier opinion, the panel suggested that both laws were equally antique because California's substantive common law is also old.  The panel wisely chose not to include that point in its most recent opinion, because the point finds no support in California precedent.  California courts regularly consider the vintage of statutes of limitations or repose in weighing a conflict of laws.  E.g., McCann, 225 P.3d at 527; Ashland Chem. Co. v. Provence, 181 Cal. Rptr. 340, 341 (Ct. App. 1982).  California's substantive law allows a possessor to retain property unless a timely suit is filed.  In the context of this particular dispute, the only relevant part of California law is the statute of limitations.  No one has ever disputed that the Cassirers are the rightful owners and that the painting was stolen; the only question concerned the statute of limitations.  See, e.g., Cassirer II, 737 F.3d 613 (entire opinion rejecting TBC's challenges to California's statute of limitations).  To address the situation underlying this specific dispute and others like it, the California legislature had no reason to modify the underlying substantive law; instead, the California legislature had reason to—and did—modify its

Spain's law is antique in a second sense, too. "If one of the competing laws is archaic and isolated in the context of the laws of the federal union, it may not unreasonably have to yield to the more prevalent and progressive law." Id. at 726. Spain's law is certainly isolated "in the context of the laws of the federal union." Id. TBC has cited the laws of only one state, Louisiana, in support of its contention that Spain's laws are not isolated. TBC Supp. Br., Dock. No. 138, at 17 (2023). Even Louisiana's law is questionably relevant in the specific context of art stolen by Nazis, in light of Congress' enactment of the Holocaust Expropriated Art Recovery Act of 2016, Pub. L. No. 114-308, 130 Stat. 1524 (2016), which is intended to increase recovery, throughout the nation, of stolen art by victims of Nazi theft. Regardless, even if Spain's law possibly comports with the law of one out of 50+ jurisdictions in the United States, that fact merely proves that Spain's law is isolated. Spain's law also runs counter to the prevailing modern international trend. See, e.g., German Civil Code (BGB) § 932; Swiss Civil Code (ZGB) Arts.3(2), 728; Cassirers' Supp. Br., Dock. No. 136, at 15–18 (2023) (describing the return of paintings from other jurisdictions); Cassirers' Supp. Br., Dock. No. 86, at 25–27 (2022) (listing international treaties urging the return of art stolen by Nazis to the rightful owner).[3]

In sum, California's law is specific, recent, and fully consistent with the modern trend both domestically and

---

statute of limitations, thus evincing California's overall attention to the specific modern problem. The myopic reasoning of the panel's earlier opinion is illogical and without support in California law.

[3] The German law is found at https://www.gesetze-im-internet.de/englisch_bgb/englisch_bgb.html#p3791, and the Swiss law is reproduced at ER 22–23.

internationally, while Spain's law is generalized, old, and counter to the "more prevalent and progressive law," Offshore Rental, 583 P.2d at 726, of nearly every other state and the international consensus. This factor independently and strongly supports the application of California's law in the particular circumstances of this case: the recovery of art stolen by Nazis.[4]

The panel's opinion disputes neither that Spain's law is old and generalized nor that it runs counter to the overwhelming domestic and international consensus. Cassirer, 89 F.4th at 1238. Instead, the opinion dismisses those factors for two reasons. Neither is persuasive.

First, according to the opinion, "[t]he Cassirers' argument strikes at the social worthiness" of Spain's law. Id. That is decidedly not so. The facts that Spain's law is old and generalized and isolated, whereas California's law is recent and specific and common, are just that—facts on the ground. No judgment is required as to which jurisdiction's law is more worthy. Even if one held the view that Spain's law is more socially worthy, that view would not change the facts just recounted: new vs. old; specific vs. generalized; and common vs. isolated. And California's choice-of-law test selects the modern, specific law over an antique, isolated one. Offshore Rental, 583 P.2d at 727–28.

---

[4] The California Supreme Court also considers whether the law is "infrequently enforced or interpreted even within its own jurisdiction, and, as an anachronism in that sense, should have a limited application in a conflicts case." Offshore Rental, 583 P.2d at 726 (emphasis added). It is unclear whether a Spanish court has ever applied its property law to artwork stolen by Nazis but, even if so, the law remains anachronistic in the other senses mentioned by Offshore Rental and discussed in text.

Second, the panel's opinion asserts that none of that matters because TBC held the painting in good faith; the three-year limitations period under Spanish law applies; and the good-faith provision is consistent with the law in some jurisdictions. Cassirer, 89 F.4th at 1233, 1238. The panel's opinion is mistaken.

There has never been a finding that TBC held the painting in good faith. The only finding made by the district court was that TBC's actions were not criminal because it lacked actual knowledge of theft. Cassirer v. TBC, No. CV 05-3459-JFW (Ex), 2019 WL 13240413, at *20–*22 (C.D. Cal. Apr. 30, 2019). The question of TBC's good faith or lack of good faith was never addressed because TBC held the painting for six years before the Cassirers discovered it, rendering irrelevant whether the three-year or the six-year period applied. See Cassirer III, 862 F.3d at 965 ("The parties agree TBC's possession was peaceful from 1993 until 1999," which was "the relevant six-year period."). For support, the panel's opinion cites only a single page of the district court's 2019 decision, Cassirer, 89 F.4th at 1233 (citing Cassirer, 2019 WL 13240413, at *19), but that page states only the district court's finding that "TBC has possessed the property . . . for more than 6 years (from 1993 to 1999)," Cassirer, 2019 WL 13240413, at *19. Until this panel's recent decisions, no court in this case has ever suggested that the three-year statute of limitations applies. To the contrary, both we and the district court have referred to "the relevant six-year period" of 1993 to 1999. Cassirer III, 862 F.3d at 965; accord Cassirer, 2019 WL 13240413, at *19.

Moreover, TBC clearly lacked good faith. Spain bought the painting from Baron Hans Heinrich Thyssen-Bornemisza. The district court concluded that the Baron

held the painting in <u>bad faith</u>, because of several "red flags" found on the painting itself. <u>Cassirer</u>, 2019 WL 13240413, at *16, *19. Those red flags included "the presence of intentionally removed labels" from the painting which, the district court found, should have raised suspicions. <u>Id.</u> at *16. The court credited a declaration that there is "no legitimate reason" to remove labels; the "removal of such labels is like filing off the serial number on a stolen gun— clear cause for concern." <u>Id.</u> Other red flags included the presence of "a torn label demonstrating that the Painting had been in Berlin," "the fact that Pissarro paintings were often looted by Nazis," and "the well-known history and pervasive nature of the Nazi looting of fine art during the World War II." <u>Id.</u> Those same red flags apply equally to Spain's later purchase of the painting. And an additional red flag applies to Spain's purchase from the Baron: the district court found that it was "generally known" that the Baron's family "had a history of purchasing art and other property that had been confiscated by the Nazis." <u>Id.</u> at *4.

In sum, TBC bought the painting from a family well known for trafficking in art stolen by Nazis; the Nazis targeted Pissarro paintings; a torn label revealed that this particular Pissarro painting had been in Berlin; and the painting had missing labels akin to a filed-off serial number—yet TBC declined to investigate <u>at all</u> the provenance of the painting. TBC may have lacked actual knowledge that the painting was stolen, but there is little question that, had the district court reached the question, it would have ruled that TBC lacked good faith.

Notably, the Cassirers raised this precise issue—that TBC's possession was <u>not</u> in good faith—prominently in their petition for rehearing. PFR at 20–22. TBC <u>failed to address it</u> in the Response, implicitly acknowledging that the

Cassirers are correct on this point. The panel's opinion plainly misstates the record, and that misstatement caused legal error.

Viewing the record in proper light, the factors discussed above independently and strongly support the application of California's law.

### b.  Function and Purpose of the Laws

The second factor in California's comparative impairment analysis is "the function and purpose" of each jurisdiction's laws. Offshore Rental, 583 P.2d at 727. We must apply the law that achieves the "maximum attainment of underlying purpose by all governmental entities." Id. at 726 (citation omitted). That determination requires "identifying the focal point of concern" of the respective laws and "ascertaining the [c]omparative pertinence of that concern to the immediate case." Id. at 726 (citation omitted).

Applying California's law here would affect the purpose of Spain's law only minimally. Spain's law allows possessors of personal property to gain title after the passage of time, and its purpose is to "assur[e] Spanish residents that their title to personal property is protected." Cassirer, 89 F.4th at 1236 (citation omitted). Applying California's law here and in other cases involving artwork stolen by the Nazis would result in only a very small impairment of the purpose of Spain's law. Thousands, if not millions, of property transactions occur every year in Spain, but only a miniscule number of them involve artwork stolen by Nazis, or even fine art more generally. The purpose of Spain's law is entirely unaffected except in the tiniest sliver of cases.

Applying Spain's law, by contrast, would eviscerate entirely the function and purpose of California's law except

in the rarest of circumstances, which appear never to have occurred.  California's law allows the recovery of stolen artwork as long as the rightful owner files suit within six years, and its objectives are to deter theft, facilitate recovery for victims of theft, and "protect[] the rightful owners of fine arts who are disposed of their property."  Id. (quoting Cassirer III, 862 F.3d at 963).  Applying Spain's law here and in other cases involving artwork stolen by Nazis would completely undermine the function and purpose of California's law.  The only possibility of non-impairment would be a hypothetical, rare case in which the possessor is personally a criminal, triggering the longer statute of limitations, and the rightful owner discovers the artwork quickly enough.

The panel's opinion focuses on those rare cases, id. at 1245, but it is important to emphasize just how rare—or perhaps nonexistent—those cases are.  As an initial matter, the burden of proving that the possessor is a criminal is incredibly high: a plaintiff must prove that the possessor had actual knowledge that the painting was stolen.  Moreover, Spain's law allows recovery from criminals only if the rightful owner brings suit quickly enough—here, within twenty-six years.  Applying that analysis to the facts of this particular dispute leads to a remarkable conclusion:  Let's assume that all purchasers before TBC—the Nazis in Germany and the purchasers in California, Saint Louis, and Switzerland—were criminals because they had actual knowledge that the painting was stolen.  If any of those purchasers had moved to Spain and displayed the painting, Spanish law would deny recovery to the Cassirers, even against a criminal, because the criminal would have gained title by the passage of twenty-six years.  In other words, the possibility that a plaintiff could prove that a possessor was

criminal in a case in which the extended statute of limitations mattered is theoretical only; it would not avail the Cassirers.

The panel's opinion also reasons that California's objectives are not impaired because California law allows suit only within six years of discovery. Id. at 1244–45. If the rightful owner waits too long to sue, then Spain's law doesn't affect the result, so the purpose of California's law is not impinged in every case. Id. That reasoning is illogical and a red herring. The purpose of California's law is to require the return of stolen artwork but only if the plaintiff brings suit within six years. There is simply no frustration of California's purpose in situations in which the plaintiff fails to file a timely action, just as there is no frustration of California's purpose in cases in which the defendant prevails for reasons having nothing to do with the conflict of laws (lack of personal jurisdiction, suit brought by someone other than the rightful owner, failure to prove that the artwork was stolen, and so on).

In sum, applying California's law would impair Spain's interests in only a miniscule number of cases, whereas applying Spanish law would completely eviscerate California's interests in all realistic cases.

c.  Relative Impairment of Spain's and California's Interests and Policies

The two factors discussed above compel the conclusion that California law applies. (1) California's law is new, specific to stolen fine art, and consistent with modern trends domestically and internationally, and Spain's law is old, general to all personal property, and isolated with respect to domestic and international laws. (2) Applying California's law will have only a tiny effect on the function and purpose of Spain's law, but applying Spain's law will completely

undermine the function and purpose of California's law. Putting the two factors together, California's interests and policies would be entirely undermined by applying Spain's law, but applying California's law will affect Spain's interests and policies in only a tiny number of cases. Therefore, California law applies.

Yet another consideration specific to this particular dispute bolsters that conclusion.  Spain's interests and policies in this <u>specific</u> context—artwork stolen by Nazis— point in <u>opposing</u> directions.  Spain has a generic interest in applying its archaic adverse-possession rules, including with respect to artwork.  But Spain <u>also</u> has a stated policy of promoting the recovery of artwork stolen by Nazis.  Spain voluntarily signed two treaties—the 1998 Washington Conference Principles on Nazi-Confiscated Art, and the 2009 Terezin Declaration on Holocaust Era Assets and Related Issues—which morally commit Spain to returning artwork stolen by Nazis to the rightful owner.[5]  Those treaties are not legally binding (if they were, Spanish law would track California law and there would be no conflicts analysis).  But California law asks whether the jurisdiction's <u>interests and policies as a whole</u> would be impinged.  Here, whatever interest Spain has in enforcing its general adverse-possession rules to artwork stolen by Nazis is counterbalanced by its internationally declared, specific policy of returning that narrow category of artwork.  Spain's overall interests and policies would be affected only minimally.

---

[5] The treaties are available at https://www.state.gov/washington-conference-principles-on-nazi-confiscated-art/ and https://www.state.gov/prague-holocaust-era-assets-conference-terezin-declaration/.

Those treaties have real effects.  As a direct result of those treaties, the United States and other signatories have enacted legislation that allows rightful owners—including rightful owners in Spain—to recover artwork found in those nations.  See, e.g., Holocaust Expropriated Art Recovery Act of 2016, Pub. L. No. 114-308, 130 Stat. 1524, 1525–26 § 3(1) (2016) (stating that the primary purpose of the Act is to "ensure that laws governing claims to Nazi-confiscated art and other property further United States policy as set forth in the Washington Conference Principles on Nazi-Confiscated Art, the Holocaust Victims Redress Act, and the Terezin Declaration"); Cassirers' Supp. Br., Dock. No. 136, at 15–18 (2023) (describing the effect of the treaties in other nations).

Once again, this reasoning does not judge the social worthiness of Spain's policies.  Instead, it merely acknowledges the simple fact that Spain has signed the treaties.  Spain could have declined to sign the treaties.  Or it could have signed only the parts of the treaties having to do with topics other than stolen artwork.  But it did not.  It voluntarily chose to sign the treaties in full, thus expressing its national policy of encouraging the return of artwork stolen by the Nazis.  Indeed, the district court found that Spain's failure to return the Cassirers' painting is inconsistent with those commitments, Cassirer, 2019 WL 13240413, at *26.

A precedent by the California Supreme Court is instructive.  In Bernhard v. Harrah's Club, 546 P.2d 719 (Cal. 1976), a club in Nevada allegedly served alcohol to an intoxicated person from California, who then crashed her car in California, and the victim sued the club.  California law, at the time, allowed suits against taverns that serve alcohol to intoxicated persons, but Nevada law did not.  Id. at 721.

The court held that Nevada had a strong interest in enforcing its laws to taverns located in-state.  Id.  But the court held that the case turned on the fact that the club in Nevada voluntarily advertised in California.  Id. at 725.  Nevada's interest "will not be significantly impaired when as in the instant case liability is imposed only on those tavern keepers who actively solicit California business."  Id.  The same reasoning applies here.  Spain voluntarily chose to sign the treaties, and Spain's interest in applying its general property law will not be significantly impaired by applying California law specifically to artwork stolen by Nazis, which is consistent with Spain's voluntarily undertaken moral commitments.

In sum, applying Spanish law would completely eviscerate California's interests in all realistic cases, whereas applying California's law would impair Spain's interests in only a few cases and, even in those cases, would be consistent with Spain's national policy of allowing recovery of artwork stolen by Nazis.  California law applies.

### d.  The Nonexistent Conduct of the Plaintiffs in Spain

The panel's opinion devotes most of the analysis to a factor that applies with only ordinary force.  It is undisputed that a jurisdiction has a general interest in regulating the conduct of defendants in that jurisdiction.  Applied here, it is undisputed that Spain has a general interest in applying its property laws because the painting is found in Spain and because TBC possessed the painting there.  We have held repeatedly that Spain certainly has an interest in regulating the property interests of persons and entities, like TBC, who possess property in Spain.  Cassirer, 89 F.4th at 1236; Cassirer VI, 69 F.4th at 565; Cassirer III, 862 F.3d at 963.  Indeed, that general interest is what gives rise to the

conflict—at step two of California's choice-of-law test, described above—with California's competing "strong interest" in this case. Cassirer, 89 F.4th at 1236 (quoting Cassirer III, 862 F.3d at 963). Spain's interest in its generic property laws and in regulating the conduct of defendants in Spain applies with ordinary force here.

The panel's opinion, though, gives that factor undue weight in the context of this particular case. The general principle that a jurisdiction has an interest in regulating conduct within its borders applies with especially strong force, the California Supreme Court has held, in a specific circumstance not present here: when a plaintiff voluntarily enters the jurisdiction and is harmed in that jurisdiction. In several cases, including the two cases principally cited by the panel's opinion—Offshore Rental, 583 P.2d 721, and McCann, 225 P.3d 516—the California Supreme Court has held that, because a plaintiff voluntarily entered the other jurisdiction and was harmed there, it is reasonable to apply that other jurisdiction's law. The court's reasoning for applying the general principle—a jurisdiction has an interest in regulating conduct within its borders—with special force plainly turned on the fact that the plaintiff had voluntarily entered the jurisdiction and been harmed there.

In Offshore Rental, the plaintiff's employee visited Louisiana and was injured in a car crash there. 583 P.2d at 722. The court applied Louisiana law and reasoned as follows: "By entering Louisiana, plaintiff exposed itself to the risks of the territory, and should not expect to subject defendant to a financial hazard that Louisiana law had not created." Id. at 728 (emphasis added) (citation, internal quotation marks, and brackets omitted).

In McCann, the plaintiff alleged that he was injured by asbestos exposure in Oklahoma. 225 P.3d at 518. The court applied Oklahoma law because the exposure "occurred in Oklahoma in 1957, at a time when plaintiff was present in Oklahoma and was an Oklahoma resident." Id. at 534. The McCann court summarized the reasoning in Offshore Rental and held:

> By parity of reasoning, because plaintiff in the present case was in (and, indeed, a resident of) Oklahoma at the time of his exposure to asbestos, for which he claims [the defendant] should be held responsible, it is reasonable to conclude that he "should not expect to subject defendant to a financial hazard that [Oklahoma] law had not created[.]"

McCann, 225 P.3d at 535 (emphasis added) (second brackets in original) (quoting Offshore Rental, 225 P.3d at 534).

That reasoning plainly does not apply here, because the Cassirers never voluntarily took the painting to Spain. The panel's opinion fails to address that key distinction. Instead, the opinion focuses myopically on the defendant's conduct only; it disregards entirely that the plaintiffs never took any relevant action in Spain.

The California Supreme Court's special solicitude of another jurisdiction's authority to regulate conduct within its borders plainly turned on the plaintiff's voluntary entry into that jurisdiction. Where, as here, that specific circumstance is not present, a jurisdiction's general interest in regulating matters within its borders carries only ordinary weight. The

heavy reliance in the panel's opinion on cases such as Offshore Rental and McCann is unwarranted.

### 4. Conclusion

Proper application of California's choice-of-law test to this case compels the conclusion that California law applies.

### B. This Case is Exceptionally Important.

This case is the rare one that is exceptionally important notwithstanding that it concerns an issue of state law only.

We have published seven opinions in this case over the past fifteen years. The case is so important that we granted rehearing en banc after an earlier opinion, Cassirer v. Kingdom of Spain, 590 F.3d 981 (9th Cir. 2009) (order), and the Supreme Court granted certiorari from a different earlier ruling, Cassirer v. TBC, 142 S. Ct. 55 (2021).

As Judge Callahan noted, unlike most cases, this particular case has a strong moral component. Cassirer, 89 F.4th at 1246 (Callahan, J., concurring). And the result in this case is at odds with her moral compass. Id. Similarly, the district court held that Spain's actions are inconsistent with that nation's moral and treaty commitments. Cassirer, 2019 WL 13240413, at *26. And the full panel has acknowledged the moral component of the case. Cassirer v. TBC ("Cassirer IV"), 824 F. App'x 452, 457 n.3 (9th Cir. 2020) (unpublished).

The moral dimension of this case does not dictate the legal result. I agree fully with Judge Callahan that, if the law requires it, we must rule contrary to our moral compass. Cassirer, 89 F.4th at 1246 (Callahan, J., concurring). But, here, the law points decidedly in the same direction as our moral compass. And the moral dimension of the case adds

significant importance to our reaching the legally correct result.

The case also has attracted unusually intense media coverage the world over.  Articles have been published in essentially every major newspaper in the United States along with many smaller domestic papers, as well as publications in Spain, Germany, the United Kingdom, France, the Netherlands, Italy, Mexico, Canada, Colombia, Brazil, Argentina, Australia, New Zealand, Israel, South Africa, Hong Kong, Bangladesh, Thailand, and regional publications in Europe and Asia more generally.  The media understandably have recognized the moral dimension, too, and have characterized the case as "perhaps the highest-profile case of World War II art restitution."  The Nazis forced a Jewish woman to hand over a priceless painting.  85 years later, judges said her family can't have it back., Business Insider (Jan. 11, 2024); see, e.g., Editorial: It's outrageous that a Spanish museum refuses to return Nazi-looted art to the rightful heirs, L.A. Times (Jan. 13, 2024) ("It is shameful that the museum and the Spanish government refuse to do what is just and moral, which is to return the painting that Lilly Cassirer hung on the wall of her apartment in Berlin."); 'The Pissarro case': a moral dilemma for Spain, El Pais (Jan. 12, 2024); Madrid's Thyssen Museum hangs on to Pissarro painting looted by Nazis, Le Monde (Feb. 2, 2024) ("Although a California appeals court ruled in favor of the cultural institution against the descendants of the despoiled Jewish family, the legal victory is causing unease."); Jewish groups in Spain are troubled by their government's decision to cling onto a painting looted by the Nazis, Business Insider (Jan. 24, 2024) ("In a shock[ing] legal decision earlier this month, a California court determined that Spain has the right to hold onto a

valuable painting looted by the Nazis rather than returning it to the family of the Jewish woman it was stolen from.").

The world is watching. We should apply the law correctly to this high-profile and morally weighty case. Nor is the contrary result unfair to Spain or its instrumentality, TBC. TBC may have lacked actual knowledge that the painting was stolen, but there is no unfairness in requiring TBC to relinquish it. As described above, despite several strong red flags suggesting that the painting had been stolen by Nazis, TBC voluntarily chose not to investigate <u>at all</u> the painting or its provenance. Nothing required TBC to investigate, but TBC bore the risk that its rightful owner would make a claim.

C. Conclusion

If this case involved an ordinary thief and an ordinary object—a heist of an expensive jewel, say—then the application of Spanish law likely would make sense for many of the reasons given in the panel's opinion. But this case involves artwork stolen by Nazis. That distinction matters, when analyzing California's choice-of-law rules, because California has legislated specifically with respect to the return of artwork stolen by Nazis and because the international community, including the United States and Spain, has coalesced around the principle that artwork stolen by Nazis should be returned to the rightful owner. Nor is this a case where the plaintiff chased an advantageous forum; Claude Cassirer moved to California in 1980, more than a decade before Spain bought the painting, and two decades before he discovered the painting. California's choice-of-law test asks which jurisdiction's interests and policies would be more impaired by applying the other jurisdiction's law. A straightforward application of that test

in the particular circumstances of this case leaves no doubt: California's interest would be completely impaired, but Spain's interests and policies would be impaired only minimally and only in a few cases.

I regret this court's failure to rehear this case en banc.